**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| In re: | Bankruptcy No. 22–30244 |
| Jack A. Glasser, | Chapter 7 |
| Debtor. | |
| _____/ | |
| Messiahic, Inc. d/b/a PayJunction, | |
| Plaintiff, | |
| vs. | Adversary No. 23–7006 |
| Jack A. Glasser, | |
| Defendant. | |

| | |
|---|---|
| In re: | Bankruptcy No. 22–30243 |
| Jace C. Schacher, | Chapter 7 |
| Debtor. | |
| _____/ | |
| Messiahic, Inc. d/b/a PayJunction, | |
| Plaintiff, | |
| vs. | Adversary No. 23–7007 |
| Jace C. Schacher, | |
| Defendant. | |
| _____/ | |

**MEMORANDUM AND ORDER**

Plaintiff Messiahic, Inc. d/b/a PayJunction, filed Adversary Complaints on May 12, 2023, alleging Debtor Jack A. Glasser and Debtor Jace C. Schacher fraudulently induced customers of Glasser Images, LLC, to prepay for photography goods and

1

services with their credit cards at a time when Glasser and Schacher knew that Glasser

Images could not or would not provide the goods and services.  PayJunction asserts

Glasser's and Schacher's acts and omissions further defrauded PayJunction by enabling

Glasser Images to accept customer credit card payments and spend the funds (often for

the personal enrichment of Glasser and Schacher), while Glasser and Schacher knew

that PayJunction would ultimately be liable for credit card chargeback claims filed by

customers who did not receive the services promised.  PayJunction seeks a

determination that the debt Glasser and Schacher owe it is excepted from discharge

under 11 U.S.C. § 523(a)(2)(A).  Additionally, PayJunction alleges that Glasser's conduct

toward PayJunction was willful and malicious, providing a second basis to except the

debt Glasser owes to PayJunction from discharge under 11 U.S.C. § 523(a)(6).  On June

13, 2023, Glasser and Schacher filed Answers denying PayJunction's allegations and

seeking dismissal of the Complaints.

Several weeks before trial, PayJunction filed motions for partial summary

judgment, and Glasser and Schacher filed motions for summary judgment.  After oral

argument on May 28, 2024, the Court denied the motions.

At the request of the parties, the Court heard evidence offered in support or

defense of the claims and causes of action in both adversary proceedings at trial on

June 5 through 10, 2024.  For the reasons provided below, the Court finds in favor of

PayJunction on its section 523(a)(2)(A) cause of action against Glasser.  It finds in favor

of Schacher on PayJunction's claims and cause of action.

I.    **FACTS**

A.    **Jack Glasser and Glasser Images' Business Model**

Glasser grew up in Bismarck, North Dakota, and lived there until October 2022, when he moved to Florida.  Glasser's interest in photography began in high school when he took photographs for the school newspaper and volunteered to take senior portraits for friends.  When he was 16 years old, Glasser started his first photography business. High school friends and acquaintances paid Glasser a $50 sitting fee and $25 for a compact disc that included fully-edited photographs with a copyright release.

After graduating from high school in 2007, Glasser enrolled in college at the University of Mary in Bismarck, where he took business and marketing courses.  While attending college, Glasser participated in a leadership academy that hosted or promoted an "idea fair" and an "entrepreneur fair."  Glasser developed a photography business plan and entered and won both fairs.  He invested the $2,000 in prize money in photography equipment and marketing for his business.  His business grew.  Rather than completing college, Glasser elected to focus on his photography business, which he called "Jack Glasser Photography."  He took some courses and read some books, but most of Glasser's business knowledge is derived from personal experience and advice from various business leaders he met while developing and managing his business.

In 2009, Glasser formed Glasser Images, LLC.  On the advice of an accountant, Glasser Images elected to be taxed as an S corporation in 2014.  From the inception of the business until he closed it in 2021, Glasser remained the sole owner or shareholder, officer and manager of Jack Glasser Photography and Glasser Images.

Also in 2009, Glasser Images leased studio space, hired a few employees and began offering wedding photography.  Glasser Images continued to offer photography

services for senior pictures and family portraits as well.  Through paid advertising and

word of mouth, the business grew.  On behalf of Glasser Images, Glasser hired more

employees and subcontractors over the next several years, and Glasser Images

extended services to clients who lived outside North Dakota.  Around 2015 or 2016,

Glasser Images outgrew its studio and began leasing space in downtown Bismarck.[1]  At

some point, it offered business portraits and other commercial advertising services.  In

2018 or 2019, it began offering videography services for weddings as well.  During this

time frame, Glasser Images retained the services of 23 full-time employees and over 100

subcontractors.  Glasser maintained that it was always his vision to continue to grow the

company and explore new business opportunities.[2]

Initially, Glasser Images hired subcontractors to assist the employee

photographers with weddings.  Later, Glasser Images retained subcontractors to shoot

both videos and photographs at weddings.  Glasser Images retained all responsibility for

editing the photographs and videos in-house, however.  According to Glasser, Glasser

Images maintained a certain recognizable brand and quality that displayed creativity and

captured the personality of its customers.  He trained Glasser Images' employees to

behave professionally and maintain this brand and quality.[3]

---

[1] In 2019, Glasser Images paid $5,563 per month for this space.  Ex. 232 at 5 (table).  Rent expense grew to $8,303 per month by 2021.

[2] Producing a feature-length film was among the new business opportunities Glasser explored.  In or about 2019, Glasser Images invested approximately $90,000 in this movie.  Glasser explained that he hoped the film would generate revenue for the business, provide training for his new videography staff and promote Glasser Images' production capabilities.  Eventually, Glasser Images sold most of its interest in this film for $30,000, but it retained the royalty rights.

[3] As part of his effort to promote Glasser Images' brand, convey quality and maintain an image of success, Glasser leased a Mercedes-Benz vehicle for $1,631.49

Glasser testified that it was his vision to tell the story of a client's wedding day. Glasser Images offered photography and videography services for 6 to 9 hours with hundreds of edited images (roughly 100 per hour) to capture the entire wedding day. Glasser Images priced the wedding packages accordingly.  It charged fees based on the number of hours and number of photographers and/or videographers dedicated to each wedding day.  Wedding customers also received a one-hour engagement photography session, USB drive with edited images, full copyright release and a photo album. Glasser Images published its standard pricing and packages on its website.

To reserve the day, Glasser Images required all wedding customers to pay a deposit/retainer.  It offered customers several payment options: one-third of the fee; one-half of the fee; or full payment.  Glasser Images also accepted a monthly payment plan. If customers agreed to pay in full on the booking day, they received a 10% discount.[4]  All deposits for wedding contracts were nonrefundable (with one or two exceptions).  If clients cancelled a wedding booking, Glasser Images permitted the clients to transfer the deposit to a gift card or credit that they could use in the future, but it did not refund money.

Periodically, Glasser Images offered promotions to incentivize clients to hire it. The promotions included price reductions and printed photographs.  Glasser consulted

---

per month, which Glasser Images paid.  Glasser Images also routinely paid for vehicle detailing because photographers occasionally used the Mercedes-Benz to transport clients during a photography shoot.  Additionally, Glasser Images purchased five Jeeps with company logos for photographers to drive.  He ensured that the employees kept the vehicles clean and uncluttered.

[4] Jace Schacher, a Lead Wedding Client Consultant and Glasser's boyfriend, testified that Glasser never pressured him to secure full payment upon booking.  The discount for immediate payment in full was a standard practice for many years.

with the Lead Wedding Client Consultants and other employees about promotions and pricing, but Glasser ultimately decided and approved the promotions, discounts and pricing.

Glasser Images used standard wedding contracts for photography and videography.  The pricing and some of the terms of these contracts differed among customers depending on the number of hours devoted to a wedding and the number of photographers and/or videographers the client selected.  Clients could change the terms of their agreements if they wanted to increase or decrease coverage, but other terms remained the same.  Glasser approved the terms of these contracts.

If a wedding client decided to proceed with a contract, the Lead Wedding Client Consultant entered the client's personal and billing information and package selections into ShootQ, the software Glasser Images used to organize, track and invoice clients. The software created a separate file for each client, which included the client's contract and correspondence.  After the Lead Wedding Client Consultant entered the information necessary to "book" the wedding and typed his or her name on the signature line, ShootQ generated an email to the client with a link and instructions describing how to log in to a portal that allowed the client to review the contract, sign it and make electronic payments.  In other words, a client could sign the contract and pay his or her invoice without direct contact with a Glasser Images representative.  Glasser estimated that 90% of Glasser Images' wedding clients paid their invoices through the electronic system.[5] The system automatically generated a receipt when a customer made a payment.  The

---

[5] Sierra Hall, Glasser Images' full-time in-house bookkeeper and accountant, estimated that Glasser Images received 75% of its revenue from credit card payments and 25% of its revenue from cash or checks.

receipts and invoices included all of the products and services provided under the contract.  If the client did not pay in full immediately, ShootQ sent automatic payment reminders.

When a client booked a wedding, Glasser assigned the project to an in-house photographer or subcontractor based on the location of the wedding.  After the wedding, Glasser Images' staff took approximately three to four months to edit and upload the photographs to an online gallery.[6]  Glasser Images focused on quality over speed.

For the first 10 years of his photography businesses, Glasser took photographs and participated in editing them.  For the last six years of his business, he primarily managed the business.  Glasser worked long hours the entire time he owned the business.

**B.    Glasser Images' Bookkeeping System**

From the time he began his photography business, Glasser recognized the importance of paying taxes and tracking finances.  In 2005, he hired his first accountant, Jennifer Eaton from Singer & Associates, to prepare his taxes.  When the business started growing and Glasser hired employees, Eaton assisted him with payroll, income taxes and other tax liabilities.

As a sole proprietor of Jack Glasser Photography, Glasser saw no "large reason" to distinguish and separately track business and personal expenses.  When Glasser Images began using QuickBooks in 2009, Eaton taught Glasser the importance of differentiating between personal and business expenses and documenting them properly in Glasser Images' accounting system.  Glasser claimed that he understood the

---

[6] Glasser Images used ShootProof, an online printing gallery, to upload, edit and share photographs with its clients.

importance of separately tracking business and personal expenses and that he was "meticulous" in his efforts to account for business and personal expenses.  He did not ensure that only business expenses were paid from the Glasser Images' account, however.  Rather, he routinely paid or requested Glasser Images bookkeepers to pay both business and personal expenses from the business account.[7]  The personal expenses that Glasser Images paid included Glasser's food, clothing, liquor and personal vacations; payments to his mother, Joan Glasser; and some of Jace Schacher's (his boyfriend's) personal expenses.  Luxury items like a $2,621 Louis Vuitton business bag and an $8,000 trip to Yellowstone were among the personal expenses he charged to Glasser Images.  He also used Glasser Images' funds to routinely treat employees and contractors to meals at upscale restaurants like Pirogue Grill, Butterhorn and The Wood House.[8]

Based on financial statements dated 2018 or later, it appears that Glasser discontinued owner draws, and Glasser Images began routinely recording Glasser's personal expenses as "Loans to Glasser."[9]  His loan balance totaled $499,111 as of

---

[7] Stephanie Thorp, a Certified Public Accountant who worked with Glasser Images, testified that this practice is common, estimating that the majority of business owners intermingle business and personal expenses.

[8] Glasser maintained, and the General Ledger shows, that the funds Glasser spent on personal luxury items comprise a small percentage of Glasser Images' expenditures.  Glasser insisted that, other than these items, his lifestyle was not lavish.  He lived in a two bedroom townhome in Mandan worth only $200,000.  He owned no lake home, boat, or timeshare, and he invested in no expensive hobbies.

[9] Glasser did not submit expense reports for his personal expenses. Schacher handled this task.  Schacher prepared expense reports that included personal expenses incurred by Glasser individually, Schacher individually and Glasser and Schacher together.  Accountants booked all of these personal expenses that Glasser Images paid as "Loans to Jack," but Glasser prepared no documentation regarding these loans.

December 2020, according to Glasser Images' 2020 tax return.  Glasser charged personal expenses to Glasser Images even when the business struggled with cash flow and debt retirement issues.  Glasser Images also paid Glasser a salary.

Glasser admitted that Glasser Images failed to maintain a formal budget, and the business deposited all its funds into one general operating account with American Bank Center.  Glasser Images made no effort to escrow or segregate deposits or retainers in a separate account for contracts that would be performed in the future.  It maintained no reserves for contracts where services were performed in the future.

In 2017 or 2018, Stephanie Thorp, a Certified Public Accountant, began working with Glasser Images.[10]  Thorp assisted Glasser Images with tax preparation, payroll, account reconciliation and other accounting work.  Also in 2018, Glasser Images hired Sierra Hall as a full-time in-house bookkeeper and accountant.  Glasser testified that from 2018 through 2021, Glasser, Thorp and Hall performed all financial management tasks for Glasser Images.

Although he received no education or formal training in accounting, Glasser kept informed about Glasser Images' cash flow and general financial condition.  He met with Hall daily to discuss past due invoices, income and correspondence from customers and creditors.  He spoke to mentors, accountants and financial advisors about Glasser Images' finances and felt comfortable moving forward with his vision even when Glasser Images faced financial challenges because "that's what happens when you grow."

---

According to Thorp, it is not uncommon to record a spouse's expenses as a loan to the owner.

[10] In 2019, Eaton left the firm where both Eaton and Thorp worked.

### C.    Glasser Images' Financial Downfall

Despite developing a quality reputation and winning awards for its photography services, Glasser Images struggled with profitability.  Glasser admitted that his business realized a profit in only some of the first ten years, and he conceded that Glasser Images struggled financially in 2019, 2020 and 2021.  Thorp testified that the business last turned a net profit in 2017, and the profit that year totaled only $15,000.  A First Western Bank & Trust Credit Presentation, which referenced Glasser Images' tax returns, suggests Glasser Images realized net losses of $278,728 in 2018, $723,711 in 2019 and $654,906 in 2020.  Ex. 253 at 10.

Debt servicing was among Glasser Images' most difficult challenges.  Glasser Images secured its first $10,000 line of credit with Gate City Bank and repaid the initial draw in 2009.  In 2015 or 2016, Glasser Images began borrowing money to finance the business.  In late 2018 or early 2019, Glasser Images obtained a $300,000 line of credit for working capital from First Western Bank & Trust that Glasser guaranteed.  One of Glasser's mentors pledged a portion of his investment account to secure this line of credit.  Glasser Images also obtained a term loan for debt consolidation and working capital in the sum of $491,047 that Glasser also guaranteed.  A First Western Credit Presentation suggests "First Western entered into a banking relationship with [Glasser Images] in late 2018 with the assumption that an investor was looking to come into the business with significant equity injection."  Ex. 233.

In preparing the information necessary to secure the business loans, Glasser sought advice from the North Dakota Small Business Development Center, which assigned someone to assist him with formal business projections.  His accountants

helped him prepare financial statements with reports generated from QuickBooks.[11]  He understood that obtaining a large commercial loan presented risk, but he was willing to take that risk to grow the business.

Chad Johnson, Market President of the Bismarck branch of First Western, worked with Glasser on loan repayment issues.  In early January 2019, Glasser requested more credit, explaining that Glasser Images needed an additional $150,000 to $250,000 in immediate funding.  Glasser acknowledged that Glasser Images had realized a "less than stellar 4th quarter." Ex. 231.  In his email exchanges with Johnson, Glasser reported that the Glasser Images' bank account totaled -$4,500 on January 20, 2019, due to payroll expenses.  Ex. 232.  Johnson advised Glasser that First Western would "need to see some repayment" toward current debt before Johnson would recommend loaning additional funds to Glasser.  Ex. 231.  Johnson recommended that Glasser seek investors willing to contribute equity to the business, which Glasser pursued with little or no success.

Based on First Western's review of Glasser Images' financial condition, it appears that Glasser Images struggled throughout 2019.  In its Credit Presentation dated December 12, 2019, First Western assigned a "substandard" risk rating to the Glasser Images loans.  Ex. 233.  First Western defined a "substandard" loan as one with  "distinct possibility that the bank will sustain some loss if the deficiencies are not corrected."  Id. at 10.  One example of a deficiency that may result in a loss is when

---

[11] Glasser testified that he was always "forthright and honest" about financial information and projections he gave Glasser Images' lenders.  Chad Johnson, Market President of the Bismarck branch of First Western, agreed that Glasser provided the financial information that First Western requested, and Glasser was forthright about the financial challenges Glasser Images faced.

"cash flow deficiencies jeopardize future loan payments."  Id.  Johnson testified that the loan-to-value ratio of collateral for this loan was outside the policy parameters.  First Western expected a significant investment in Glasser Images, but it had not occurred by December 2019.  At trial, Johnson confirmed that he believed Glasser Images suffered from "financial issues" in 2019.

Hall also testified that Glasser Images faced financial struggles in 2019.  She remembered that Glasser Images received "constant" complaints from subcontractors who called for updates on payments owed to them.  She admitted that Glasser directed her to "slow walk" payments to subcontractors.  He also provided excuses for the delay in payment that he asked her to relay to subcontractors, including untruthfully telling a subcontractor or two that his or her check was lost in the mail.[12]

In early 2020, Glasser spent months negotiating a loan consolidation with First Western to ease Glasser Images' debt service obligations.  On March 16, 2020, Johnson reported to the First Western Loan Committee that Glasser Images "may be turning the corner as it has been profitable 2 of the last three months."  Ex. 235.  Johnson did not make a recommendation regarding Glasser Images' consolidation request because he needed "additional time to determine the best debt structure going forward."  Id.

On March 19, 2020, at the outset of the COVID-19 pandemic, Glasser reported to First Western that the business would not make it a week without additional capital.

---

[12] Despite this example of dishonest behavior, Hall testified that she trusted Glasser and Schacher, and they never gave her reason to think that they were dishonest.

Ex. 237 at 1.  First Western declined to provide additional capital to Glasser Images, but it granted a 60-day loan extension. Id. at 2.

According to Glasser, the pandemic played a significant role in Glasser Images' financial struggles.  Glasser described an onslaught of client calls and emails seeking to postpone or reschedule weddings.  Clients cancelled weddings due to illness, and Glasser Images cancelled shoots due to photographer illness or unavailability.  Glasser Images charged no fees to reschedule weddings, but rebooking weddings meant the future dates were not available to new customers, affecting future cash flow.

Shortly after the pandemic began, Glasser attempted to ease cash flow pressures by issuing physical paychecks rather than directly depositing employees' wages.  Glasser hoped that employees would deposit their checks on different days, spreading the demand on Glasser Images' funds.

In March or April 2020, Glasser applied for COVID-19 relief programs.  On April 10, 2020, Glasser Images received $245,000 in Paycheck Protection Program ("PPP") forgivable funding through Starion Bank.  It also received an initial $10,000 forgivable Economic Impact Disaster Loan ("EIDL") on April 20, 2020.  In late April 2020, Glasser sought a COVID-19 PACE Recovery Program loan through the Bank of North Dakota. In an email exchange with Glasser, Johnson explained that Glasser Images must show sufficient cash flow prior to the pandemic to be eligible for this program, and Glasser Images could not rely on a third-party guaranty to qualify for the loan.  Ex. 238.  Since Glasser Images did not operate with positive cash flow before the pandemic, it did not qualify for the PACE Recovery Program.  Id.  Although the terms of the PACE program were favorable, Johnson advised Glasser that additional debt would not help Glasser Images' cash flow issues.  Id.  A month later, in May 2020, Glasser Images received an

additional $150,000 in EIDL funding with payments deferred until May 2021.  Ex. 248.

In June 2020, Glasser considered investing in real estate with an eye toward improving Glasser Images' cash flow issues.  Every year since childhood, Glasser visited a rental cabin in the Black Hills of South Dakota.  The owners of the cabin, who became close friends, offered to sell 80 acres of undeveloped land to Glasser.  The owners offered to self-finance Glasser's acquisition.  Glasser, in turn, considered purchasing the land with a loan from Glasser Images and then using it as collateral for a consolidation loan to amortize Glasser Images' operating costs over 30 years.  He proposed this idea to an accountant and business consultant, Toby Kommer, who is Chief Executive Officer of Haga Kommer, Ltd.  Kommer worked in the same accounting firm as Eaton and Thorp.   Kommer suggested that amortizing operating costs over a long period of time was not ideal, but he agreed that a consolidation loan "would definitely free up cash flow and reduce some interest costs."  Ex. 240.  Ultimately, the owners refused to sell the land under the terms Glasser proposed because they were concerned about Glasser encumbering it.

Also during the summer of 2020, Glasser attempted to ease cash flow pressure by switching from employee debit cards to credit cards.  According to Glasser, Glasser Images' employees spent approximately $60,000 per month in corporate expenses during the wedding season.  With debit cards, Glasser Images essentially paid these expenses as the employees incurred the charges.  Glasser reasoned that deferring payment of employee expenses to the end of the month may alleviate some cash flow issues.  Consequently, he requested American Bank Center issue credit cards to Glasser Images employees with a $60,000–$80,000 monthly limit.  Steven Zottnick, Vice President of Business Banking at American Bank Center, expressed concern

14

about Glasser Images' profitability and its practice of not paying the corporate credit card balance in full each month.  He informed Glasser that Glasser Images "would have to go through an approval process," before the bank would consider issuing credit cards with the limit requested.  Ex. 242.  He also advised Glasser that without improvement in profitability and demonstrated ability to pay the account balance in full each month, Glasser Images "would probably just have to continue to use [] debit cards."  Id.

Glasser's repeated failures to secure additional credit ultimately drove him to enter at least one agreement with a short-term, high-interest lender in or around June 2020.  While Glasser could not recall the exact interest rate the lender charged Glasser Images, he estimated that the rate was at least double the rate charged by a traditional lender.  A June 23, 2020, Glasser Images balance sheet shows a loan from PayPal with a 20% interest rate.

Despite the infusion of pandemic relief funds and "good profit" for August 2020, Glasser Images continued to struggle with cash flow problems in September 2020.  Exs. 243, 245.  Glasser suggested in correspondence to First Western on September 2, 2020, that "credit cards and PayPal are sucking all the cash out of the business."  Ex. 243.  On behalf of Glasser Images, Glasser requested that First Western fund a $1.6 million loan, including a $1.2 consolidation loan and $400,000 in additional funds. Johnson advised Glasser that First Western would not advance additional funds due to insufficient collateral and the risk this presented.

Glasser Images increased its year-over-year revenue in 2020 despite the challenges presented by the pandemic, with gross revenue totaling over $1.7 million in 2019 and $1.8 million in 2020.  Confused, Johnson asked Glasser how revenue could grow if the pandemic adversely affected the business.  Glasser explained that wedding

bookings grew, but the commercial side of the business struggled because other businesses were not willing to spend money on advertising.

Even with the growing revenue, Glasser Images still could not cash flow its recurring obligations.  In an email to Glasser, Johnson highlighted the combined increases in payroll and advertising expenses which outpaced Glasser Images' revenue growth by more than double.  Ex. 244.  Johnson explained to Glasser that the ratio was untenable and suggested that the "goal should be to have that reversed."  Id.  Glasser conceded that Glasser Images' financial position was due to increases in payroll and advertising expenses.  He planned to remedy the situation by transitioning all employee photographers and videographers to subcontractors and focusing the business on weddings.  Glasser also anticipated that the transition from employee photographers and videographers to subcontractors would save approximately $30,000 per year on equipment expenses if the subcontractors used their own equipment. Ex. 248 at 6.

In November 2020, Glasser turned to Kommer for more advice.  Given Glasser Images' debt and insufficient cash flow to retire it, Kommer anticipated that most banks and investors would be unwilling to provide the business funds.  He offered no "real good" suggestions other than a bankruptcy reorganization.  Ex. 249.  Glasser declined to pursue bankruptcy at that time.

As contemplated, sometime in 2020 or 2021, Glasser Images pivoted from employee photographers to subcontractors and began paying subcontractors every 30 days, rather than weekly, to provide cash flow cushion.  Glasser Images also raised prices in 2020 or 2021, but this solution offered little relief because fewer clients booked photography sessions.

16

In January 2021, Glasser Images received a second forgivable PPP loan for $257,500. Despite these funds, Glasser Images' cash flow issues persisted throughout 2021. Hall recalled that bank overdrafts became more frequent in 2021. In May 2021, Glasser felt compelled to seek more assistance from short-term lenders. Glasser Images borrowed a total of $94,600 from two short-term, high-interest lenders in May 2021.

The negative retained earnings Glasser Images reported on its tax returns also suggest financial distress. On its 2019 tax return, Glasser Images reported ($972,816) in retained earnings. Ex. 253 at 8. This negative balance continued to accumulate with Glasser Images reporting ($1,627,722) in retained earnings on its 2020 tax return and ($2,284,884) through July 31, 2021. Id.

On June 29, 2021, Glasser contacted Zottnick with American Bank Center regarding payments that did not clear due to insufficient funds in Glasser Images' operating account. Jacob Nesvig, Regional Business Lead at American Bank Center, informed Glasser that his account management was unacceptable because there were 235 nonsufficient fund items since he opened the account, with ten of them occurring in June 2021.[13] Nesvig advised Glasser the bank would not honor any checks until Glasser Images deposited funds sufficient to create a positive balance. Two days later, Glasser Images borrowed $134,950 from another short-term, high-interest lender.[14] A

---

[13] Zottnick testified that 235 nonsufficient fund items with ten in the last month was significant and could be indicative of financial distress or poor account management. American Bank Center charged $30 for each insufficient fund item.

[14] Review of Glasser Images' General Ledger suggests that the company borrowed over $445,000 from at least four short-term lenders from May 2021 to September 2021.

couple of weeks later, on July 15, 2021, Glasser once again emailed Zottnick regarding a negative account balance in Glasser Images' operating account because a few employees' paychecks bounced.  Ex. 252.  Glasser told Zottnick that Glasser Images anticipated receiving $350,000 in EIDL funding shortly.  Glasser Images received the EIDL funds on August 5, 2021.

The EIDL funds were not sufficient to resolve Glasser Images' cash flow issues, however.  In September 2021, Glasser Images applied for a 90-day loan extension from First Western.  In the Credit Presentation dated September 22, 2021, a loan officer and a credit analyst with First Western reported that Glasser Images realized gross revenue in the sum of $1,192,033 and expenses totaling $1,141,397 from January 1, 2021, to July 31, 2021.  Ex. 253.  Employee and advertising expenses comprised $613,176 of the total expenses for this six-month period.  The authors also reported high wages and advertising expenses in the 2019 and 2020 Financial Summary on the same Credit Presentation:

- Income/Expense:
    - Gross Revenues totaled $1.85MM in 2020 which was a slight increase from 2019.
    - Cost of Goods Sold totaled $40M which leads to a Gross Profit of $1.82MM.
    - Total Expenses totaled $2.41MM which was an increase of 4% from 2019.
    - The largest expenses come from Wages which totals $1.06MM and Advertising which totals $590M.
    - Operating income comes in at a loss of ($589M).
    - Net Income (Loss) for 2020 totaled ($655M) which was a slight increase in comparison to 2019.

Id.

The authors of the Credit Presentation downgraded Glasser Images' credit rating from "substandard" to "doubtful."  Id.  According to the definitions section in the Credit

Presentation, a doubtful credit rating is one where collection is "highly questionable or

improbable." Id. Highlighting Glasser Images' payroll and advertising expenses, the

authors of the Credit Presentation opined:

> The business has struggled in terms of cash flow for the last several
> reasons mainly due to management's inability to provide expense control
> with payroll and advertising.  This is being changed going forward as
> ownership is slowly converting a portion of its staff from an hourly wage to
> more of a commission type of compensation structure.

Id.

At trial, Johnson confirmed that payroll and advertising expenses served

as the primary reason Glasser Images failed to cash flow.  He testified:  "My

theory of everything was, particularly, the company's advertising expense as well

as their payroll expense, with the number of employees they had, was just too

high and that was sucking up all the revenue being generated, and that was the

reason for the company not to be able to cash flow."

While its financial position continued to deteriorate, Glasser Images offered three

types of discounts to potential customers in September 2021, including incentives

requiring immediate payment for a wedding in the future.  Glasser insisted that he

believed Glasser Images would survive despite its challenges.

In addition to pursuing a loan extension with First Western, Glasser also worked

with the Small Business Administration to obtain a $1.5 million loan to Glasser Images

that he hoped to use to pay the First Western debt.  On October 4, 2021, months after

he applied, Glasser received a letter from the SBA denying his loan request due to a

lack of ability to repay.  Immediately after reading the letter, Glasser requested the SBA

reconsider the loan denial.

Throughout the periods when Glasser Images struggled to meet payroll or other obligations, Glasser used personal assets to fund the business. He liquidated his retirement account and borrowed money to pay Glasser Images expenses. He also guaranteed business loans. Additionally, Glasser borrowed money from his parents, his uncle, his mother's college roommate, his mentors, Schacher and Schacher's cousin to satisfy Glasser Images obligations. This practice continued through July 15, 2021, when he informed Zottnick with American Bank Center that he anticipated a $10,000 deposit into Glasser Images' operating account from a family friend who agreed to loan the money. His friends and family received no interest in the business in return for the money they provided.

Glasser recalled somewhere between 10 and 20 instances where he and Schacher delayed depositing their paychecks because they knew Glasser Images' operating account lacked sufficient funds. On one occasion, Glasser also asked Sierra Hall, the staff accountant, to delay depositing her paycheck.

Always confident of his plan, goals, vision and solutions for cash flow issues, Glasser continued to search for solutions to address the financial problems until he found none. On October 6, 2021, the Glasser Images' bank account held insufficient funds to meet its payroll obligations or to pay the outstanding invoices from subcontractors. Glasser consulted with Hall about Glasser Images' inability to "make payroll" and then advised Glasser Images' staff they would not be paid. Many of them packed their belongings and left. Glasser testified that he decided to close his photography business on October 7, 2021, after 16 years of business. Hall, who had access to Glasser Images' financial information and who met with Glasser daily, testified that she was "shocked" when Glasser announced that he was closing the business. Glasser never

mentioned closing the business during any of their daily meetings.

Glasser Images discontinued business operations on October 7, 2021.

### D.    Jace Schacher and His Role in Glasser Images

Like Glasser, Schacher grew up in Bismarck and lived there until he and Glasser moved to Florida in October 2022.  Schacher did not attend college, and he has never owned a business.  He received no training in accounting.

After graduating high school in 2008, Schacher worked at a podiatrist clinic as a receptionist and office assistant.  His work at the podiatrist clinic led to employment at a chiropractic clinic, where he performed similar receptionist and office assistant duties, such as pulling files, assisting patients with intake forms, greeting patients and answering telephone calls.

Glasser met Schacher in 2009, and they began dating a short time later.  In May 2010, the couple started living together and sharing assets and expenses.  They opened a joint checking account that Glasser maintained, but they held separate credit cards. According to both Glasser and Schacher, Glasser managed the couple's personal finances.  Glasser and Schacher still live together.

When they met, Schacher worked at a chiropractic clinic, but he left that job to accept a position at the Dakota Zoo.  Schacher served as the Office Manager as well as the Gift Shop and Concessions Manager at the Dakota Zoo until June 2016, when Glasser Images hired Schacher.  Glasser and Schacher explained that they decided to devote their energy to growing Glasser Images.  Consequently, Schacher accepted a position with Glasser Images.

Initially, Schacher's job at Glasser Images was limited to office duties, such as greeting customers, answering telephone calls, coordinating photoshoots, emptying the

dishwasher and carrying out garbage.  Sometime between 2017 and 2019, Schacher

began working as a Lead Wedding Client Consultant.  In this role, his duties included

responding to inquiries; meeting with clients; answering questions; explaining wedding

package options, pricing and available discounts; and booking weddings.  Schacher also

assisted with preparing wedding itineraries and scheduling the engagement session for

clients—services included in the wedding package.  After he accepted the Lead

Wedding Client Consultant position, Schacher received a small raise in salary.  He

testified that his salary totaled approximately $40,000 per year after the promotion.

Glasser Images employed two Lead Wedding Client Consultants: Schacher and

McLauren Alexander, whom Glasser Images hired in 2018.  They served in the same

role with the same job responsibilities and the same authority to schedule weddings,

enter contracts on behalf of Glasser Images with wedding clients, and provide incentives

or discounts based on promotions Glasser approved.  They split the work based on the

days of the week the company received customer leads.  When issues arose with

wedding bookings, Glasser met with both Alexander and Schacher to discuss these

issues.

Schacher's duties did not include accounting or business analysis, and he never

assumed responsibility for the finances of Glasser Images.  He did not track the number

of wedding bookings or analyze the cost of goods sold.  He was not included in financial

meetings between Glasser and Sierra Hall, and he did not meet with accountants,

bankers and business consultants like Zottnick, Kommer, Johnson and Thorp on matters

related to the operation of Glasser Images.  He had no direct access to Glasser Images'

bank accounts or QuickBooks.  He did not guarantee Glasser Images' business loans.

He did not draft Glasser Images' contracts.

Schacher maintained that he was not interested in becoming a business partner with Glasser, and he never spoke to Glasser about becoming a business partner. He explained that he does not feel like he has those "qualities."

Despite holding no ownership interest in Glasser Images, Schacher used his Glasser Images debit card for both business and personal expenses. At Glasser's request or with his consent and knowledge, Glasser Images paid for many of Schacher's personal expenses including food, clothing, haircuts and hair products, liquor and vacations with Glasser. These expenses included luxury items, such as the cost of regularly detailing his vehicle, meals at upscale restaurants, Fendi swim trunks, a Tiffany ring, Ralph Lauren and Dolce & Gabbana clothing and Swarovski binoculars. Glasser was with Schacher when one or both men charged personal expenses like travel and haircuts to a Glasser Images credit card.

Like all employees who worked for Glasser Images, Schacher completed expense reports every week from 2018 to 2021. Unlike other employees, Schacher reported both business and personal expenses on Glasser Images' expense reports. Hall processed Glasser Images' payments for expenses submitted on expense reports and managed some of the couple's personal finances. If Schacher forgot to report an expense charged to a Glasser Images account, Hall asked Glasser if the expense should be reported as a business or personal expense. If Schacher was unsure how to categorize an expense, he asked Glasser or Hall.

Schacher testified that he did not know the extent of Glasser Images' debt until after the business closed, but he conceded that he knew there were times when Glasser Images was short on cash. For example, in November 2020, Glasser asked Schacher for financial help because Glasser Images had "cash flow issues." Consequently,

23

Schacher obtained a personal loan and deposited the $34,132 in loan proceeds into the joint checking account with Glasser.[15]  Glasser subsequently transferred the funds to Glasser Images.  Schacher also liquidated his retirement account and transferred the funds to Glasser or Glasser Images to cover business expenses.  He did not expect a "return on his investment" for these fund transfers.  Schacher also recalled circumstances when his Glasser Images debit card was declined due to insufficient funds in the business account.  Additionally, Glasser asked him to refrain from depositing his paycheck on a few occasions.

Schacher insisted that he did not know Glasser Images would soon close when he booked the DesCamps/Cundy wedding on October 4, 2021.[16]  Likewise, he testified that, on October 5, 2021, he had no idea the business would close.  Schacher attended the October 6, 2021, Glasser Images staff meeting where Glasser announced that the company did not have funds sufficient to meet payroll.  Glasser continued to search for solutions to pay employees after that meeting, according to Schacher.  Schacher claimed that he was surprised when Glasser announced that the business was closing on October 7, 2021.[17]  He maintained he was not involved in the decision to close Glasser Images.

---

[15] No other employees loaned Glasser Images money.

[16] Brody Cundy testified Schacher was "pushy" during a photography consulting meeting between Mr. Cundy and his fiancée, repeatedly suggesting the couple consider the discount provided if the couple paid in full in advance of their wedding.

[17] Glasser confirmed that he did not inform Schacher about the SBA's refusal to grant Glasser Images the $1.5 million loan it requested and maintained that Schacher had only limited knowledge or awareness of Glasser Images' financial situation.

E.    **Glasser Images' Windup**

On the day Glasser Images closed, Glasser "shut off" the software, ensuring that Glasser Images stopped accepting new client funds after October 7, 2021.  Although Glasser acknowledged that Glasser Images received two credit card payments on October 6, 2021, and two on October 7, 2021, Glasser testified that he was unaware of these payments at the time, and he avowed that Glasser Images did not seek payment from clients or attempt to collect money on contracts after October 7, 2021.  After October 7, 2021, Glasser provided no services to those who previously booked photography or videography shoots.  He insisted that he did not have the equipment or capacity to meet these commitments.

After Glasser Images closed, Glasser received numerous calls and emails from clients, subcontractors and the press, and several death threats.  He testified that he was overwhelmed.  He declined to answer the telephone or respond to customer calls or emails.  He did not edit photographs others took; he did not fulfill the contracts for weddings booked in October.

Several days or weeks after the business closed, ShootProof began providing images to customers.  Glasser assisted ShootProof with its efforts to mine and provide this data.  He sold personal property and borrowed money from friends and relatives to maintain the data and software necessary to provide the images to ShootProof.  He received no compensation for this work.

Likewise, Schacher and other employees of Glasser Images did not respond to customer inquiries.  Schacher had no contact with any Glasser Images clients after Glasser Images closed, but he worked with ShootProof to access client photographs and upload the images on Glasser Images' hard drives.  More specifically, ShootProof

25

retained Schacher as a subcontractor from early 2022 to May or June 2022 to process the raw images provided by subcontractors or stored on Glasser Images computers, which was a very time-consuming process.  Schacher also generated a list of subcontractors and linked the subcontractors to the clients' photographs.

In October 2022, after Schacher completed his work with ShootProof, Schacher and Glasser moved to Florida.

### F.    Glasser and Glasser Images' Business Relationship with PayJunction

PayJunction is a closely held credit card processing company that develops software for a "payment gateway," operates the processing software and processes credit card payments.  It provides credit card processing services for approximately 6,000 clients with a monthly volume of approximately $1 billion.

In 2012, ShootQ referred several credit card processors to Glasser, including PayJunction.  Glasser selected PayJunction because its processing fees were lower than its competitors.

Glasser signed an initial Merchant Application with PayJunction as President of Glasser Images in October 2012.  PayJunction offers no training for merchants who contract with it.  It views the agreement to be an arm's length commercial transaction between all parties and expects the merchants to read the contract.

On December 4, 2017, Glasser signed an updated Merchant Application that incorporated a Merchant Card Processing Agreement[18] provided in a separate attachment.  Doc. 49 at ¶¶ 4, 5.  By signing the agreement, the "MERCHANT

---

[18] The PayJunction Merchant Application refers to the Merchant Card Processing Agreement as "Terms and Conditions."

acknowledges it has received and read the Terms and Conditions at the time of signing."

Id. at ¶ 5.  Glasser signed on behalf of Glasser Images and in his personal capacity.[19]

Id. at ¶ 4.

Under the Merchant Card Processing Agreement, PayJunction, as the payment

processor and an independent sales organization ("ISO"), provided payment processing

services to Glasser Images.  Id.  Eric Wernicke, co-owner, co-founder and Vice

President of PayJunction, explained that several parties are involved in credit card

payment processing.  When a client uses his or her credit card to pay a merchant like

Glasser Images for goods and services, a debt is recorded on the client's credit card

account with a "Card Association," such as Visa, MasterCard or American Express.

PayJunction processes the payment and immediately transfers a provisional credit to the

merchant's settlement account.  The credit remains provisional until the date of final

settlement, which is typically six to twelve months after the goods or services are

delivered, depending on the credit card issuer. [20]

---

[19] The Merchant Card Processing Agreement included a guaranty provision which
provided, in pertinent part,

> I absolutely and unconditionally guarantee the full performance of all
> MERCHANT's obligations to the Guaranty Parties, together with all costs,
> expenses, and attorneys' fees incurred by any Guaranty Party in connection
> with any actions, inactions, or defaults of MERCHANT.  I waive any right to
> require the Guaranty Parties to proceed against other entities or
> MERCHANT. There are no conditions attached to the enforcement of this
> GUARANTY. I authorize the Guaranty Parties, their respective agents or
> assigns to make from time to time any personal credit or other inquiries and
> agree to provide, at request, financial statements and/or tax returns.

Id. at ¶ 4.  Eric Wernicke, co-owner, co-founder and Vice President of PayJunction,
knew of no PayJunction requests for financial information from Glasser.

[20] Pursuant to the Merchant Card Processing Agreement:

Until the final settlement date, a consumer may dispute the charge. Wernicke maintained that, generally, customers will seek a refund directly from a merchant if they did not receive the merchandise or services or if they are not happy with the quality. If this effort is unsuccessful, the customer may seek a refund from his or her credit card issuer. When a card issuer returns a disputed transaction, it is called a chargeback. After a customer initiates the chargeback process, the merchant must respond within seven to twenty-one days, according to Wernicke who cited the operating rules.[21] If the merchant does not successfully rebut the chargeback claim or does not participate in the process, PayJunction refunds the consumer. It then seeks reimbursement from the merchant, who is ultimately liable for the chargeback. If the merchant's settlement account does not contain sufficient funds to refund the chargeback, PayJunction

---

(a) [PayJunction] will provide provisional credit to Merchant for each undisputed and valid Transaction that Merchant submits to ISO by crediting Merchant's Settlement Account, provided Member Bank and ISO have received settlement for the valid Transaction through the Interchange procedures specified by the Card Association applicable to the Card used for the Transaction (Member Bank and ISO do not provide payment for all Card types for which Authorization services are provided) . . . Provisional credit to Merchant for a Transaction disputed by a Cardholder for any reason is not final.

\* \* \*

(c) Merchant acknowledges that all payments and credits provided to Merchant are provisional and subject to suspension, to Chargebacks and to adjustments in accordance with the Merchant Agreement, including, but not limited to the Operating Rules.

Ex. 202 at § 3.4; Doc. 49 at ¶ 7.

[21] The deadline, information and documentation required from a merchant depends on a number of factors, including issuer rules, timing and delivery of goods and services, PayJunction's requirements, and the nature of the dispute. See Doc. 81–1; Exs. 205, 207, 208, 209.

absorbs the loss.[22]  Wernicke revealed that PayJunction does not have insurance to cover this loss.

Glasser testified that he had no idea who would absorb loss resulting from Glasser Images' failure to provide photography services or refund the deposit at the time he closed the business.  He assumed Glasser Images' clients "would be out the money."  He insisted he did not know PayJunction would suffer the loss.

According to Wernicke, Glasser Images' responsibilities included ensuring that the number of customer fraud and chargeback claims remained below certain threshold standards common in the industry.  Wernicke suggested the industry threshold for chargebacks was below 1% of all transactions, which Glasser Images exceeded after it closed.  Glasser Images also assumed liability for "any advice from, acts of, as well as omissions, acts of fraud or acts of misconduct by, Merchant's employees, ISOs, consultants, advisors, contractors, Merchant Servicers, Agents, officers and directors." Doc. 49 at ¶ 6; Ex. 202 at § 2.2.

Under the terms of the Merchant Card Processing Agreement, Glasser Images agreed to "comply with the Merchant Agreement for submitting and processing Transactions with [PayJunction]."  Doc. 49 at ¶ 6.  PayJunction was "responsible to Merchant for processing Transactions under the Operating Rules for the Card Program services to which Merchant subscribes, which may vary among Card types."  Id.

---

[22] Wernicke testified that PayJunction was liable to Glasser Images' customers for credit card chargebacks under the operating rules and the Merchant Card Processing Agreement and documents incorporated into it.  He maintained that, "if we don't pay that, our sponsoring institutions and banks … will essentially boot us off the network.  They won't allow us to operate business anymore."  He explained that PayJunction's sponsoring credit card institutions or banks would absorb the loss if PayJunction did not pay.

Pursuant to the Merchant Card Processing Agreement, Glasser Images also agreed to

"comply with any applicable laws and Operating Rules for the card type processed." Id.

at ¶ 7; Ex. 202 at § 6.1; Ex. 201 at § 11.

Additionally, the Merchant Card Processing Agreement included certain

representations and warranties, to which the Glasser Images agreed:

> 4.3 There have been no materially adverse changes in information provided in the Merchant Application or in Merchant's financial condition, or management;
>
> * * *
>
> 4.5 The Transaction is genuine and arises from a bona fide sale of merchandise or services by Merchant, represents a valid obligation for the amount shown on the Transaction Receipt and does not involve the use of the Card for any other purpose;
>
> * * *
>
> 4.7 The Transaction is not subject to any dispute, set-off or counterclaim;
>
> * * *
>
> 4.9 Each statement on the Transaction Receipt is true, and Merchant has no knowledge of facts that would impair the validity or collectability of the amount of the Transaction; [and]
>
> * * *
>
> 4.16 Merchant will immediately notify Member Bank and [PayJunction] in writing of any material changes to any information provided herein including but not limited to a change in Merchant's legal entity, location, business type, or the types of goods and services offered for sale by Merchant.

Doc. 49 at ¶ 8; Ex. 202. Wernicke claimed that PayJunction relied on these

representations and others Glasser made in the agreement.  He testified that Glasser

Images did not notify PayJunction of the materially adverse changes in its financial

condition.  Glasser claimed he was not aware of this obligation at the time Glasser

Images realized materially adverse changes in its financial condition.

Under Section 15 of the Merchant Card Processing Agreement, Glasser Images

was obligated to reimburse PayJunction for any sums paid by PayJunction or for which

PayJunction is liable for chargebacks.  Doc. 49 at ¶ 9; Ex. 202 at ¶ 15.  The Merchant

Card Processing Agreement further provides that PayJunction has all of the rights and

remedies of the cardholders.  Doc. 49 at ¶ 9; Ex. 202 at ¶ 15.  PayJunction may also

assert any claim on behalf of a credit cardholder individually or on behalf of all

cardholders as a class.  Doc. 49 at ¶ 9.  Glasser Images also agreed to pay all

attorneys' fees incurred by PayJunction in enforcing the agreement.  Ex. 202 at § 20.1.

Between the initial contract with PayJunction and the date Glasser Images closed,

Glasser had little contact with PayJunction.  Glasser spoke to a PayJunction

representative over the telephone or corresponded by email occasionally if he needed a

code or a client's credit card was declined.

Although Glasser did not dispute receiving the Merchant Card Processing

Agreement, Glasser does not recall reading the Terms and Conditions/Merchant Card

Processing Agreement and no PayJunction representative discussed the terms and

conditions with him.  He explained that he simply completed the merchant application

and integrated it into ShootQ.  Glasser testified that he did not fully understand the

provisional nature of the credits provided by PayJunction, and he deposited the credits

into Glasser Images' general operating account.  He did not understand that Glasser

Images should have escrowed or held funds in reserve pending final completion of the

contracts.

Days after Glasser Images closed, its clients began disputing credit card charges

for services the company had not completed or performed.  More specifically, on or

about October 11, 2021, the customers of Glasser Images started initiating chargebacks

with the providers of their Visa, American Express, Discover, and Mastercard credit

cards.  Doc. 49 at ¶ 11.  Glasser did not advise PayJunction it closed or notify it about

customer complaints.  Glasser explained, "At that moment when we were closing, I did

not think that was something I needed to do."

31

Between October 12–19, 2021, PayJunction contacted Glasser about various chargebacks. Wernicke testified that PayJunction sought Glasser's assistance with chargebacks and explained how to handle disputes. Wernicke claimed that PayJunction also offered advice to Glasser Images and suggested that some of the damages could have been fixed or concerns remedied. PayJunction terminated its agreement with Glasser Images on October 14, 2021.[23] Exs. 217, 218. PayJunction told Glasser "there [were] over 200 chargebacks that require review and responses from Glasser Images and Jack" as of October 26, 2021. Doc. 49 at ¶ 12. On October 27, 2021, PayJunction's Director of Risk & Underwriting, Matt Odirakallumkal, reminded Glasser: "Per the terms of the agreement, Glasser Images (not PayJunction) is responsible for tracking and responding to each and every individual chargeback notification received within the time frame clearly displayed on the chargeback notification." Id. at ¶ 13. Wernicke estimated that from October 7, 2021, until the chargeback requests stopped, over 400 customers initiated approximately 600 chargeback requests.[24]

Glasser admitted PayJunction contacted him seeking his assistance with chargebacks. Neither Glasser nor any representative of Glasser Images responded to a chargeback request. Neither Glasser Images nor Glasser refunded the sums Glasser Images collected for services that it failed to provide. In response to repeated questions at trial, Glasser insisted that he did not respond or dispute chargebacks because Glasser Images' clients did not receive the full value of their purchase. This remains true even in

---

[23] PayJunction advised Glasser Images that termination of their agreement does not relieve Glasser Images of its obligation to respond to chargebacks and perform other obligations under section 11.2(f) and 11.2(h) of the Merchant Card Processing Agreement. Ex. 217.

[24] There were no chargebacks before October 7, 2021.

those situations where the client received partial performance (raw images of
photographs, for example), because the client did not receive the final product promised,
according to Glasser.

PayJunction attempted to collect the chargebacks from Glasser Images'
settlement account, but it was closed by October 12, 2021, according to Wernicke.
Glasser confirmed that the Glasser Images bank account held a negative balance
beginning on October 5, 2021, due in part to automatic withdrawals from various
creditors.  In its pleadings and at trial, PayJunction complained about Glasser Images'
failure to maintain funds in its account sufficient to satisfy chargeback requests and
Glasser Images' failure to notify PayJunction about its financial condition.

Under the Merchant Card Processing Agreement, Glasser Images agreed "to
maintain a minimum balance of funds in the Settlement Account as [PayJunction] may
specify to Merchant in writing from time to time."  Ex. 202 at § 12.2.  Glasser testified
that PayJunction never specified a minimum account balance for Glasser Images.

Section 13 of the agreement also granted PayJunction the discretion to require
Glasser Images to maintain a reserve account that would ensure repayment of disputed
consumer transactions.  Id. at § 13.1.  According to Wernicke, PayJunction did not
request Glasser Images to maintain a reserve account because these accounts are
usually only required for "high-risk" industries, like marijuana or adult entertainment.

The agreement also granted PayJunction the right to require additional collateral
from Glasser Images.  PayJunction never requested additional collateral.

Additionally, the agreement between PayJunction and Glasser Images authorized
PayJunction to obtain credit reports or financial information from Glasser Images.  Id. at
§ 8.1.  Wernicke was not aware of any PayJunction requests for financial information

from Glasser Images.  Glasser insisted that PayJunction never asked Glasser Images to provide financial reports, and Glasser never delivered them.  Likewise, PayJunction did not ask Glasser about his or Glasser Images' financial health.  Glasser maintained that he did not know the agreement required him to notify PayJunction of Glasser Images' cash flow issues.

Wernicke testified that PayJunction never knew Glasser Images was in financial distress.  He maintained that, if PayJunction had known Glasser Images was in financial distress, it would have asked for additional collateral or a reserve, imposed limits on the account, or closed the account because of the extreme risk to PayJunction and Glasser Images' customers.

Frustrated with Glasser's failure or refusal to respond to the chargeback requests after numerous demands, PayJunction initiated a lawsuit in the United States District Court for the Middle District of Georgia and filed an Emergency Motion for Preliminary Injunction.  Doc. 49 at ¶ 14.  The underlying causes of action included claims for breach of contract, breach of guaranty and injunctive relief.  Id.  PayJunction also sought a money judgment for funds owed to it pursuant to the Merchant Card Processing Agreement and Guaranty.  Id.  Additionally, it requested affirmative injunctive relief requiring Glasser Images and Glasser to provide PayJunction with information and cooperation in timely responding to chargebacks.  Id.  Glasser testified that he failed to respond to the lawsuit because he had no financial ability to retain legal representation and travel to Georgia.

On November 19, 2021, the Georgia federal court granted the Emergency Motion and issued a preliminary injunction finding that Glasser Images and Glasser "have refused to provide this information [regarding chargebacks] in a prompt manner." Id. at ¶

15.   The Georgia federal court ordered Glasser "to respond to all chargebacks and retrievals when received from the cardholders' issuing bank or financial institution before the response date noted in each notice."  Id.

On March 3, 2022, the Georgia federal court found, among other things, that: (1) Glasser Images' acts and omissions "constitute[d] breaches of the Merchant [ ] Agreement and have caused damages to PayJunction"; (2) Glasser was "in breach of his personal guaranty by failing to pay the amounts due from Glasser Images to PayJunction under the terms of the Merchant [ ] Agreement"; (3) "Glasser has not complied with the Court's orders" on the preliminary injunction; and (4) PayJunction was entitled to a default judgment for a sum certain totaling $977,241.14, which includes $900,033.36 in uncollected chargebacks, $12,579.03 in uncollected processing fees and $64,628.75 in attorneys' fees.  Exs. 223, 224, 225.  The Georgia federal court entered judgment in PayJunction's favor (the "Georgia Judgment"), and "convert[ed] the preliminary injunction . . . to a permanent injunction."  Doc. 49 at ¶ 16.  In the Georgia federal court's Order Granting Plaintiff PayJunction's Motion for Entry of Default Judgment entered on March 3, 2022, the court found, among other things, that "PayJunction's claim for Attorney's Fees against Glasser Images is legal [sic] sufficient and states a plausible claim for relief. Defendants have acted in bad faith, have stubbornly refused to comply with the Court's order to mitigate damages caused solely by Defendants' acts and omissions, and have caused PayJunction unnecessary trouble and expense[.]"  Id.

Since receiving notice of the chargebacks, neither Glasser nor Glasser Images has made a payment toward their debt to PayJunction.

### G.    PayJunction and Jace Schacher

Schacher did not sign the PayJunction Merchant Application, and he did not read

the application or the Merchant Card Processing Agreement between PayJunction, Glasser and Glasser Images.  Schacher knew that Glasser Images used PayJunction as a credit card processor, but he never spoke with a PayJunction representative.  His job did not require him to do so.  After Glasser Images closed, Schacher did not respond to chargebacks or otherwise address PayJunction's communication with Glasser Images.

PayJunction did not name Schacher as a defendant in the Georgia lawsuit it initiated, and Schacher had no involvement in it.

### H.    North Dakota Attorney General's Consumer Fraud Lawsuit

On May 3, 2022, the North Dakota Attorney General filed a consumer fraud action under N.D.C.C. § 51–15–02 against Glasser, Schacher and Glasser Images (collectively, "the Glasser Defendants"). The Attorney General alleged that the Glasser Defendants engaged in deceptive acts or practices and directly or indirectly made false statements, false promises, or misrepresentations with the intent that others rely on them, while engaging in the sale or advertisement of photography services.  Schacher expressed surprise that the Attorney General's investigation included him.

Both Glasser and Schacher testified that they cooperated with the Attorney General and complied with all subpoenas related to the lawsuit.  Both Glasser and Schacher consented to entry of judgment against them.

The North Dakota state court entered a consent judgment on January 27, 2023, in favor of the State of North Dakota.  Ex. 285.  In the consent judgment, Defendants admitted, and the state court found:

> [¶6]    Defendants Glasser Images and Jack Glasser admit that, with the intent that others rely, they engaged in acts or practices constituting violations of the consumer fraud law, N.D.C.C. § 51–15–02.

> [¶7]    Defendants Glasser Images and Jack Glasser are adjudged in

36

violation of the consumer fraud law, N.D.C.C. § 51–15–02, for engaging in deceptive acts or practices, fraud, false pretense, false promise, or misrepresentations.

[¶8]   Defendant Jace Schacher admits that, with the intent that others rely, he engaged in acts or practices constituting violations of the consumer fraud law, N.D.C.C. § 51–15–02.

[¶9]   Defendant Jace Schacher is adjudged in violation of the consumer fraud law, N.D.C.C. § 51–15–02, for engaging in deceptive acts or practices, fraud, false pretense, false promise, or misrepresentations.

[¶11] Pursuant to N.D.C.C. § 51–15–07, Defendants are restrained and enjoined from engaging in the business or acting in the capacity of a photographer or videographer in North Dakota for a period of fifteen years, and unless or until: 1) Defendants have paid in full all restitution owed to consumers pursuant to the entry of this Consent Agreement; 2) Defendants have paid in full restitution to all aggrieved consumers, whether subject to this Judgment or other consumer judgments independently obtained; 3) Defendants have paid in full all amounts owed to the Attorney General pursuant to the entry of this Consent Agreement; and 4) Defendants have otherwise fully complied with the terms of this Consent Agreement, including Paragraphs 14 through 18. "Pay in full" or "paid in full" mean that all amounts must be paid, and does not include any settlement, forgiveness, compromise, reduction, or discharge of any of the debts or refund obligations, unless otherwise agreed to in writing by Defendants and the Attorney General. Notwithstanding the terms of this Paragraph, Defendants may not engage in the business of, or act in the capacity of, a photographer or videographer, without written consent of the Attorney General or approval of the Court.

Id. Glasser and Glasser Images agreed to entry of a monetary judgment against them in the sum of $767,188 as restitution for work not completed or performed and unpaid sums to independent contractors.  Schacher agreed to entry of a monetary judgment against him in the sum of $40,000 as restitution for work not completed or performed and unpaid sums to independent contractors.  The Glasser Defendants all agreed that the judgments for consumer restitution were not dischargeable under section 523(a)(2)(A) and/or (a)(7) of the Bankruptcy Code. Glasser and Glasser Images also agreed to entry of a $25,000 judgment for civil penalties and agreed it would be nondischargeable in bankruptcy

under section 523(a)(7).  Schacher agreed to entry of a $5,000 judgment for civil

penalties and agreed it would be nondischargeable under section 523(a)(7).

Wernicke testified, and the parties agreed, that PayJunction paid $402,885.17 in

chargebacks to approximately 31.6% of the individuals identified by the Attorney General

as victims of Glasser Images entitled to restitution for the claims asserted by the North

Dakota Attorney General, representing approximately 43% of the total chargebacks paid

by PayJunction.[25]  PayJunction paid a total of $900,033.36 in chargebacks.[26]

PayJunction has made no arrangements with the North Dakota Attorney General

regarding restitution collection.

## I.    Bankruptcy

On August 14, 2022, Glasser and Schacher filed separate voluntary petitions for

relief under Chapter 7 of the Bankruptcy Code.  Consistent with the terms of the state

court consent judgment, Glasser and Schacher stipulated to the entry of a judgment

ruling that the debts they owe to the State of North Dakota are not dischargeable.  This

Court entered judgment excepting Glasser's restitution debt in the sum of $767,188 from

---

[25] Wernecke acknowledged that it is possible PayJunction paid the chargeback claims of other North Dakota Glasser Images customers who were listed as victims in the Attorney General's lawsuit but not included in the spreadsheet totals if the names on the credit card transactions did not match with Glasser Images' customers.  For example, if the parent of a North Dakota bride or groom paid Glasser Images and PayJunction refunded the parent's claim, this chargeback claim may not have been included in the $402,885.17 sum because the parent was not listed among the victims listed in the data provided by the Attorney General.

[26] Although Wernecke testified that the chargebacks totaled $934,046.85, this sum is inconsistent with the Georgia lawsuit, PayJunction's proof of claim and other evidence received.  According to the Declaration of Matt Odirakallumkal, which PayJunction offered in support of its Motion for Default Judgment in the Georgia lawsuit, the total uncollected chargebacks PayJunction claims it paid through January 10, 2022, totaled $900,033.36.

discharge under section 523(a)(2)(A) and (a)(7) and excepting his debt for $25,000 in civil penalties from discharge under section 523(a)(7).  Similarly, this Court entered judgment excepting Schacher's restitution debt in the sum of $40,000 from discharge under section 523(a)(2)(A) and (a)(7) and excepting his debt for $5,000 in civil penalties from discharge under section 523(a)(7).

In his bankruptcy schedules, Glasser disclosed that PayJunction holds an unsecured claim in the sum of $977,241.14 pursuant to the personal guaranty.  Doc. 49 at ¶¶ 19, 20.  PayJunction filed a proof of claim in the sum of "not less than $977,241.14 plus post-judgment interest, attorney's fees and other damages."  Id. at ¶ 21.  This sum includes the total chargebacks sum PayJunction paid plus other processing fees it incurred.

Schacher did not list PayJunction as a creditor in his bankruptcy case because he claims he owes no debt to PayJunction.  PayJunction filed a proof of claim in Schacher's case in the sum of $977,241.14, attaching documentation, including a copy of the default judgment entered against Glasser Images and Glasser in the Georgia lawsuit.  Schacher filed an objection to the proof of claim in his bankruptcy case on June 6, 2024, during the trial of this adversary action.

PayJunction filed the above-referenced adversary proceedings against Glasser and Schacher related to the debts it incurred for chargebacks. PayJunction seeks a determination that the debts owed by Glasser are nondischargeable under section 523(a)(2)(A) and (a)(6), and that the debt owed by Schacher is nondischargeable under section 523(a)(2)(A).

II.   **ANALYSIS**

A.   **Claims Against Glasser**

1.   **Subrogation and Derivative Claims of Actual Fraud under
11 U.S.C. § 523(a)(2)(A)**

Section 523(a) of the Bankruptcy Code excepts certain debts from discharge in

bankruptcy, including debts for money, property, services, or an extension, renewal, or

refinancing of credit, to the extent obtained by false pretenses, a false representation or

actual fraud. 11 U.S.C. § 523(a)(2)(A).  PayJunction asserts that the debt Glasser owes

to it arising from Glasser's breach of the Merchant Card Processing Agreement and the

Georgia federal court default judgment in the sum of $977,241.14 ($900,033.36 in

uncollected chargebacks, $12,579.03 in uncollected processing fees and $64,628.75 in

attorneys' fees) should be excepted from discharge based on Glasser's false

misrepresentations, actual fraud and PayJunction's right of subrogation.  The parties do

not dispute the validity of this debt.

a.   **Subrogation**

PayJunction argues that it is entitled to stand in the shoes of Glasser Images'

customers it reimbursed through the chargeback process pursuant to a clause in the

Merchant Card Processing Agreement, 11 U.S.C. § 509 and the common law doctrine of

equitable subrogation.  Arguing on behalf of these Glasser Images customers,

PayJunction claims it established actual fraud and requests an order finding it is entitled

to an exception to discharge of this debt under 11 U.S.C. § 523(a)(2)(A).  Although

PayJunction's Consolidated Post-Trial Brief is the first pleading where it raises equitable

subrogation or subrogation under section 509, it has repeatedly claimed that it was

entitled to stand in the shoes of consumers and assert their fraud claims.[27]

Courts generally agree that a subrogee may assert a third party's right to bring an exception to discharge action under section 523(a)(2), (4) or (6). See Bank of Am. v. Armstrong (In re Armstrong), 498 B.R. 229, 234 (B.A.P. 8th Cir. 2013) (applying contractual subrogation); Int'l Bank of Com. v. Saenz (In re Saenz), 516 B.R. 423, 431–32 (Bankr. S.D. Tex. 2014) (discussing equitable subordination); Aviva Life Ins. Co. v. Burton (In re Burton), 2009 WL 537163, at *6 (Bankr. E.D. Tenn. 2009) (discussing subrogation and indemnity); Kan. Bankers Sur. Co. v. Eggleston (In re Eggleston), 243 B.R. 365, 372 n.7 (Bankr. W.D. Mo. 2000) (citing cases). "It does not matter that some of those parties did not assert claims directly against [debtor]." Fid. Nat'l Title & Escrow Co. v. Gillaspie (In re Gillaspie), 2010 WL 3955830, at *7 (Bankr. D. Haw. Oct. 8, 2010).

To prove its derivative fraud claim under section 523(a)(2)(A), PayJunction must offer evidence sufficient to show: (1) it is entitled to subrogation under 11 U.S.C. § 509 or North Dakota law; and (2) Glasser Images customers whom PayJunction reimbursed can meet all the elements necessary to show they are entitled to a judgment under section 523(a)(2)(A).

---

[27] PayJunction's legal theories regarding these claims have varied throughout this litigation. In its Complaint, PayJunction alleges that Glasser defrauded its customers and then "knowingly and willfully transferred his financial obligations to PayJunction." Compl. ¶ 146. In its pretrial brief, PayJunction argues that "all of the Chargebacks at issue were paid by PayJunction to Glasser Images' customers, effectively extending the consumer fraud to PayJunction which Glasser knew that PayJunction was obligated to pay. Glasser also defrauded PayJunction when it made the Warranties each time a transaction was processed, knowing that the Warranties were false, thereby perpetuating the fraud." Doc. 64 at 11. Finally, in its posttrial brief, PayJunction asserted the right to subrogation and argues that "the evidence proves that PayJunction's claim is nondischargeable as it is a debt for money obtained by actual fraud because PayJunction stands in the shoes of the customers it made whole."

"[T]o subrogate a claim under § 509(a), one must establish that: (1) the creditor is liable with the debtor on (or has secured); (2) a claim of a creditor against the debtor; and (3) the creditor must have paid that claim." Photo Mech. Servs., Inc., v. E.I. Dupont De Nemours & Co. (In re Photo Mech. Servs., Inc.), 179 B.R. 604, 618 (Bankr. D. Minn. 1995). The payments giving rise to subrogation rights under section 509 must be made postpetition. Prim Cap. Corp. v. May (In re May), 2006 WL 4458360, *5 (Bankr. N.D. Ohio Aug. 14, 2006). PayJunction paid the large majority of chargeback claims before Glasser petitioned for bankruptcy relief. See Ex. 211. Section 509 does not provide a remedy for these prepetition claims. See Scott v. Am. Sec. Ins. Co. (In re Scott), 572 B.R. 492, 534 (Bankr. S.D.N.Y. 2017) (noting that section 509 applies when a co-obligor pays a creditor's claim postpetition); In re Ariana Energy, LLC, 2015 WL 6666245, at *4 (Bankr. E.D. Ky. Oct. 30, 2015) ("A guarantor's payment on a debt post-petition can give rise to subrogation rights under § 509."); In re Chapala Int'l, Inc., 1995 WL 17911422, at *3 (Bankr. S.D. Iowa May 26, 1995) (explaining that section 509 permits subrogation for codebtors, but it is inapplicable when payment was made prepetition); see also Collier on Bankruptcy ¶ 509.02[4] ("[T]he payment giving rise to the subrogation rights [under section 509] must be made postpetition").

Equitable subrogation is governed by state law. See U.S. Specialty Ins. Co. v. Colony Ins. Co., 2024 WL 4004051, at *5 (C.D. Cal. July 1, 2024); Glaspell v. United States (In re Glaspell), 626 B.R. 272, 276 (Bankr. D. W. Va. 2021); In re Brodkey Bros., Inc., 2013 WL 5636484, at *4 (Bankr. D. Neb. Oct. 15, 2013); Hamada v. Far East Nat'l Bank (In re Hamada), 291 F.3d 645, 651 (9th Cir. 2002). North Dakota courts have applied equitable subrogation without adopting a specific list of criteria. See, e.g., Am. Nat'l Fire Ins. Co. v. Hughes, 2003 ND 43, ¶ 8, 658 N.W.2d 330. In Star Ins. Co. v.

Cont'l Res., Inc., 89 F. Supp. 3d 1015 (D.N.D. 2015), the United States District Court

summarized the principles that apply:

> "Subrogation is an equitable remedy that provides for an adjustment
> between the parties to secure the ultimate discharge of a debt by the person
> who, in equity and good conscience, ought to pay for it." St. Paul Fire &
> Marine Ins. Co. v. Amerada Hess Corp., 275 N.W.2d 304, 308 (N.D. 1979).
> Equitable subrogation is founded on principles of equity and justice and is
> intended to protect the rights of one who has paid an obligation which should
> be imposed on another. State Farm Mut. Ins. Co. v. Wee, 196 N.W.2d 54,
> 59–60 (N.D.1971); Am. Commercial Lines, Inc. v. Valley Line Co., 529 F.2d
> 921, 924 (8th Cir. 1976). The doctrine permits a party who is not a volunteer
> or intermeddler to stand in the shoes of another with reference to all lawful
> claims and rights. BancInsure, Inc. v. BNC Nat. Bank, N.A., 263 F.3d 766,
> 772–73 (N.D. 2001). Equitable subrogation rests on the principle that no one
> should be enriched by another's loss. In re Yanke, 230 B.R. 374, 377 (8th
> Cir. 1999). The doctrine is highly favored and is to be given a liberal
> application. Id. at 379.

Star Ins., 89 F.Supp. 3d at 1032; see also BancInsure, Inc. v. BNC Nat'l Bank, 263 F.3d

766, 772 (8th Cir. 2001) (applying North Dakota law) ("Equitable subrogation ... is based

on the theory that the one invoking it has rightfully discharged debt at the instance and

for the benefit of the debtor." (quoting State Farm Mut. Auto. Ins. Co. v. Wee, 196

N.W.2d 54, 59–60 (N.D. 1971))).

Other courts apply a list of five factors, derived from In re Leedy Mortg. Co., Inc.,

111 B.R. 488, 492 (Bankr. E.D. Pa. 1990), and sometimes referred to as the Leedy test.

See In re Photo Mech. Servs, 179 B.R. at 618–19.  Under this test, equitable subrogation

is appropriate if five factors are present:

(1)    The payment must have been made by the subrogee to protect his
own interest;

(2)    The subrogee must not have acted as a volunteer;

(3)    The debt paid must be one for which the subrogee was not primarily
liable;

(4)    The entire debt must have been paid; and

(5)      Subrogation must not work any injustice to the rights of others.

Id. at 618; In re Leedy Mortg.Co., 111 B.R. at 492.

At trial, PayJunction offered evidence that some of Glasser Images' customers paid Glasser Images through credit card transactions that PayJunction processed. Most or all of these customers filed chargeback requests that PayJunction paid pursuant to its obligations to Card Associations or Member Banks as required by the Operating Rules or the Merchant Card Processing Agreement and documents incorporated into it. More specifically, PayJunction paid a total of $900,033.36 to Glasser Images customers. According to Wernicke, PayJunction risked Card Associations and Member Banks discontinuing relationships with PayJunction if it did not pay the chargebacks. Neither Glasser nor Glasser Images reimbursed PayJunction for these chargebacks as required under the Merchant Card Processing Agreement. Under this agreement, Glasser and Glasser Images agreed to grant PayJunction the rights and remedies of the cardholders and the right to assert any claim on behalf of a cardholder individually or on behalf of all cardholders as a class.

With this evidence, PayJunction established that it was obligated to pay the chargebacks in the first instance and that Glasser and Glasser Images were primarily liable for the customer/credit card users' claims because Glasser Images failed to provide the services its customers were entitled to receive as a result of the credit card payments. There is no evidence that subrogation will work an injustice if enforced against Glasser. Accordingly, under the Merchant Card Processing Agreement and the common law doctrine of equitable subrogation, PayJunction is subrogated to the rights of those Glasser Images customers who received chargeback refunds from

44

PayJunction.   PayJunction may assert a section 523(a)(2)(A) cause of action on their

behalf.

### b.    Derivative Claims Under 11 U.S.C. § 523(a)(2)(A)

Next, PayJunction must show that the debt Glasser Images owed to its customers

(which PayJuction paid) was obtained by false pretenses, false representations or actual

fraud.  In support of its claim that it offered evidence of actual fraud, PayJunction points

to Glasser's fraud admissions in the North Dakota consent judgment on which this Court

relied in determining that Glasser's restitution debt and civil penalties were excepted

from discharge in Adversary Proceeding 22–7011, <u>North Dakota v. Glasser</u>.

PayJunction claims Glasser is judicially estopped from denying he defrauded Glasser

Images' customers in this adversary proceeding because he admitted intent to defraud

them in the North Dakota consumer fraud action.  PayJunction did not limit the scope of

its actual fraud argument to North Dakota consumer fraud victims, however.  It

maintains that Glasser should be judicially estopped from denying that he defrauded all

Glasser Images customers who PayJunction refunded through the chargeback

process.[28]

Courts may apply judicial estoppel to protect the integrity of judicial proceedings:

> "[J]udicial estoppel 'generally prevents a party from prevailing in one phase
> of a case on an argument and then relying on a contradictory argument to
> prevail in another phase.'" <u>New Hampshire</u>, 532 U.S. at 749, 121 S.Ct. 1808
> (quoting <u>Pegram v. Herdrich</u>, 530 U.S. 211, 227, n.8, 120 S.Ct. 2143, 147
> L.Ed.2d 164 (2000)).  The doctrine may also apply in separate suits,
> regardless of whether all the parties in the two suits are the same. <u>See</u>
> <u>Stallings</u>, 447 F.3d at 1047 ("Judicial estoppel prevents a person who states
> facts under oath during the course of a trial from denying those facts in a
> second suit, even though the parties in the second suit may not be the same

---

[28] Like its subrogation argument, PayJunction's Consolidated Post-Trial Brief is
the first pleading in which PayJunction raised judicial estoppel.

as those in the first." (quoting <u>Monterey Dev. Corp. v. Lawyer's Title Ins.</u>
<u>Corp.</u>, 4 F.3d 605, 609 (8th Cir. 1993))).

<u>Hughes v. Canadian Nat'l Ry. Co.</u>, 105 F.4th 1060, 1068 (8th Cir. 2024).

In deciding whether judicial estoppel is appropriate, courts consider three non-exhaustive factors: "(1) whether the party's later position is 'clearly inconsistent' with its prior position; (2) whether a court was persuaded to accept a prior position 'so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled'; and (3) whether the party claiming inconsistent positions 'would derive an unfair advantage or impose an unfair detriment on the opposing party if not stopped.'" <u>Combs v. The Cordish Companies,</u> <u>Inc.</u>, 862 F.3d 671, 678 (8th Cir. 2017) (quoting <u>Smith v. AS Am., Inc.</u>, 829 F.3d 616, 624 (8th Cir. 2016)).

The application of judicial estoppel is not a rigid process governed by a set of prerequisite factors or a general formula. <u>Knigge v. SunTrust Mortg., Inc.</u> (<u>In re Knigge</u>), 479 B.R. 500, 507 (B.A.P. 8th Cir. 2012). Courts retain discretion to consider additional factual information for the application of this doctrine in different contexts. <u>Id.</u>

In the consumer fraud action filed by the North Dakota Attorney General, Glasser agreed to entry of a consent judgment, in which he admitted, and the state court found:

> [¶6]    Defendants Glasser Images and Jack Glasser admit that, with the intent that others rely, they engaged in acts or practices constituting violations of the consumer fraud law, N.D.C.C. § 51–15–02.

> [¶7]    Defendants Glasser Images and Jack Glasser are adjudged in violation of the consumer fraud law, N.D.C.C. § 51–15–02, for engaging in deceptive acts or practices, fraud, false pretense, false promise, or misrepresentations.

Ex. 285. While the North Dakota Attorney General requested, and Glasser agreed to pay, restitution to North Dakota victims only, Glasser's admissions in the consent

judgment are not limited to Glasser Images' customers who live in North Dakota. The admissions are limited only by reference to violations of N.D.C.C. § 51–15–02, which are premised on deceptive acts or practices, fraud, false pretense, false promise, or misrepresentations. Similarly, the injunction to which Glasser agreed clarifies that he is "restrained and enjoined from engaging in the business or acting in the capacity of a photographer or videographer in North Dakota for a period of fifteen years, and unless or until [he has] paid in full restitution to all aggrieved consumers, whether subject to this Judgment or other consumer judgments independently obtained." Ex. 285 (emphasis added). There is no evidence suggesting Glasser treated his North Dakota clients differently than those who lived in other states. The admissions are sufficiently broad to apply to all Glasser Images customers who paid the company with a credit card processed by PayJunction.[29]

The position advanced by Glasser in his pleadings and through the evidence he presented at trial is inconsistent with his admissions in the North Dakota Attorney General consumer fraud lawsuit. At trial, the Court received evidence showing that Glasser did not intend to defraud consumers or PayJunction. Glasser's testimony, together with emails, financial reports and other evidence, suggest Glasser Images provided high quality photography and videography services to customers around the country, but its financial management left something to be desired. Glasser Images struggled with cash flow issues beginning in 2018 due to imprudent decisions, including employing photographers rather than subcontractors, spending hundreds of thousands of dollars on advertising when word of mouth served as the primary source

---

[29] PayJunction's right to subrogation and the scope of its cause of action is limited by the chargebacks it paid and the damages arising from its claim.

of its referrals, and borrowing money with no ability to retire the debt.  Spending

Glasser Images' funds on personal luxury items when the company struggled with

cash flow issues was also imprudent, although the sum spent on these expenses

paled in comparison to employee, advertising and debt retirement expenses.

Unfortunate market conditions prompted by the pandemic added to Glasser Images'

financial stress.  Despite these financial challenges, Glasser managed to sustain

Glasser Images for years.  Glasser credibly testified that he was always confident of

his expansion plan, goals, vision and solutions for cash flow issues until access to

financial resources stopped, and he was forced to close the business.  This evidence

is consistent with Glasser's arguments in pretrial pleadings and his Answer to the

Complaint,[30] but inconsistent with Glasser's admissions in the North Dakota consumer

fraud action.  These incongruent legal positions satisfy the first judicial estoppel factor.

The second judicial estoppel factor requires the Court to examine whether

Glasser "persuaded" the North Dakota state court to accept his position and enter the

consent judgment.  Courts often decline to receive consent judgments as evidence in

unrelated lawsuits or to consider them persuasive on issues related to liability because

they are typically entered to settle a case or to obtain peace.  See, e.g., United States v.

Appelbaum, 2015 WL 13841580, at *2 (W.D.N.C. Oct. 2, 2015) (observing that the

consent judgment may have been entered for other purposes such as a "desire for

peace"); M3 Girl Designs, LLC v. Blue Brownies, LLC, 2012 WL 12885635, at *3 (N.D.

Tex. June 1, 2012) ("Federal Rule of Evidence 408 prohibits evidence of a settlement

agreement when it is offered to prove liability for or invalidity of a disputed claim. Fed.

---

[30] See Answer at 8–12 (denying PayJunction's allegations regarding false
representations to customers and fraud in paragraphs 59 to 146 of the Complaint).

R. Evid. 408(a). And a consent judgment is a settlement agreement.").  Glasser did not object to the Court receiving the consent judgment as evidence or seek to limit the purpose for which the Court could consider it.  Consequently, the Court must consider it for all purposes.

Unlike consent judgments in cases where a defendant refuses to admit statements regarding intent or to allow a recital of specific conduct, Glasser confessed to intent to defraud and admitted to engaging in deceptive acts or practices, fraud, false pretense, false promise, or misrepresentations.  The North Dakota state court noted that it was "fully advised of the premises" of Glasser's consent and entered its order and judgment accordingly.  The state court did not merely approve Glasser's admissions, it based its judgment on them.  In light of the language of the judgment and the specific admissions in it, the Court finds that Glasser persuaded the North Dakota state court to accept the position he advanced in the consumer fraud proceedings.  Given Glasser's arguments and evidence in this adversary proceeding, his admissions in the consumer fraud action create the perception that either the North Dakota state court or this Court was misled.

Finally, the Court must consider whether Glasser will derive an unfair advantage or impose an unfair detriment on PayJunction if the Court does not estop Glasser from taking a position inconsistent with his admissions in the North Dakota consumer fraud action.  Having established that it is entitled to subrogation, PayJunction steps into the shoes of Glasser Images customers and asserts judicial estoppel on their behalf.  It would be unfair to these consumers, many of whom were named as restitution victims in the consumer fraud lawsuit, to allow Glasser to take a position inconsistent with his admissions.  Accordingly, Glasser is judicially estopped from denying that he engaged

49

in deceptive acts or practices, fraud, false pretenses, false promises or misrepresentations.  These admissions are sufficient to show actual fraud under section 523(a)(2)(A).  Standing in the shoes of Glasser Images' customers, PayJunction met its burden of showing that, as subrogee of the customers, it is entitled to a judgment excepting the debt Glasser owes from discharge under section 523(a)(2)(A).

### 2.    Sum Excepted from Discharge Under 11 U.S.C. § 523(a)(2)(A)

PayJunction seeks an order excepting $977,241.14 from discharge under section 523(a)(2)(A).  This sum includes $900,033.36 in uncollected chargebacks, $12,579.03 in uncollected processing fees and $64,628.75 in attorneys' fees.  In Cohen v. de la Cruz, the United States Supreme Court held that a nondischargeable debt under section 523(a)(2)(A) "encompasses any liability arising from money, property, etc., that is fraudulently obtained, including treble damages, attorney's fees, and other relief that may exceed the value obtained by the debtor."  523 U.S. 213, 223 (1998).  Accordingly, the entire debt totaling $977,241.14 arises from Glasser's fraudulent conduct and is excepted from discharge under section 523(a)(2)(A).  See Portal Inv., LLC v. Johnson (In re Johnson), 584 B.R. 895, 910 (Bankr. D.N.D. 2018) (concluding that attorneys' fees, costs and other expenses were a result of the debtor's fraudulent nondisclosure and were excepted from discharge under section 523(a)(2)(A) and Cohen).

Contrary to Glasser's argument, this remedy does not permit double recovery.  It simply clarifies that PayJunction is subrogated to the rights of the Glasser Images customers it paid, and it grants PayJunction the right to pursue collection remedies directly against Glasser despite the discharge injunction.  To ensure that he is not

compelled to pay PayJunction as well as restitution to the North Dakota consumer fraud victims PayJunction reimbursed, Glasser may offer the evidence presented in this case to the North Dakota Attorney General demonstrating that PayJunction paid $402,855.17 of the total restitution debt Glasser owes to approximately 31.6% of the individuals identified by the Attorney General as victims.  To the extent the $402,855.17 sum underrepresents PayJunction's satisfaction of restitution debt, Glasser may use the data assembled by PayJunction to show he is entitled to satisfaction of a higher sum of restitution debt.

**B.    Claims against Schacher**

PayJunction alleges that Schacher is liable for $977,241.14 arising from the debt Glasser and Glasser Images owes to PayJunction under the terms of the Merchant Card Processing Agreement and the Georgia federal court judgment.  It asserts this debt should be excepted from discharge under section 523(a)(2)(A).

In cases in which the underlying debt is disputed, courts require a two-part analysis under section 523(a): first, the courts determine the validity of the debt under applicable law; and second, the courts determine whether the debt should be excepted from discharge under section 523.  Trans-West, Inc. v. Mullins (In re Mullins), 2020 WL 5846952, at *23 (Bankr. D. Colo. Sept. 30, 2020); Hatfield v. Thompson (In re Thompson) 555 B.R. 1, 8 (B.A.P. 10th Cir. 2016); Valadez v. Salazar (In re Salazar), 2019 WL 267777, at *8 (Bankr. D. Utah Jan. 18, 2019); Thomas Concrete of Ga., Inc. v. Osbourne (In re Osbourne), 2017 WL 1166293, at *3 (Bankr. N.D. Ga. Mar. 28, 2017); Walker v. Vanwinkle (In re Vanwinkle), 562 B.R. 671, 677 (Bankr. E.D. Ky. 2016); Symonies v. Sobol (In re Sobol), 545 B.R. 477, 490 (Bankr. M.D. Pa. 2016); Smith v. Davenport (In re Davenport), 491 B.R. 911, 921 (Bankr. W.D. Mo. 2013); Farooqi v.

Carroll (In re Carroll), 464 B.R. 293, 312 (Bankr. N.D. Tex. 2011).  Schacher disputes

that he owes money to PayJunction.  Accordingly, the Court will apply this two-step

analysis.

To establish the validity of the debt, PayJunction must show that Schacher is

liable on an enforceable obligation under applicable nonbankruptcy law.  In re

Thompson, 555 B.R. at 9.  As articulated by the Tenth Circuit Bankruptcy Appellate

Panel:

> "Debt" is defined in the Code as "liability on a claim," and "claim" is defined
> in turn as a "right to payment." For purposes of § 523(a)(2)(A), "debt"
> means liability on "an enforceable obligation." Whether a debt exists is
> determined by looking to applicable law, frequently state law. Section
> 523(a)(2)(A)'s use of the term "any debt" (emphasis added) indicates that
> "debt" as used in § 523(a)(2)(A) is not restricted to a debt established
> under any particular theory of recovery. To establish the validity of the
> debt under § 523(a)(2)(A), the claimant must establish that the debtor is
> liable on an enforceable obligation under applicable law, nothing more
> nor less.

Id. at 8–9 (footnotes omitted).  The Court looks to North Dakota law to determine

whether Schacher is liable to PayJunction under an enforceable obligation.

### 1.    Contractual Right to Payment

The debt PayJunction seeks to except from discharge arises from a contract

between PayJunction, Glasser Images and Glasser.  Schacher did not sign the

PayJunction Merchant Application, and he did not read the application or the Merchant

Card Processing Agreement between PayJunction, Glasser and Glasser Images.

Schacher knew that Glasser Images used PayJunction as a credit card processor, but he

never spoke with a PayJunction representative.  His job did not require him to do so.

After Glasser Images closed, Schacher did not respond to chargebacks or otherwise

address PayJunction's communications with Glasser Images.  PayJunction did not name

Schacher as a defendant in the Georgia federal lawsuit it initiated, and Schacher had no involvement in it.  Accordingly, PayJunction established no contractual right to payment from Schacher, and it holds no judgment entitling it to collect Glasser's or Glasser Images' debt from Schacher.

### 2.    Subrogation

PayJunction argues that a clause in the Merchant Card Processing Agreement, 11 U.S.C. § 509 and the common law doctrine of equitable subrogation entitle it to stand in the shoes of the Glasser Images customers it reimbursed through the chargeback process, claim fraud on their behalf and receive a judgment finding PayJunction is entitled to an exception to discharge of this debt under 11 U.S.C. § 523(a)(2)(A).[31]

Unlike its claim against Glasser, PayJunction offered no evidence linking its liability for chargeback claims and its claim for processing fees and attorney fees with Schacher's restitution debt.  Schacher was not a party to the Georgia lawsuit where PayJunction received a judgment for these damages, and he was not a party to the credit card processing agreement with Glasser and Glasser Images that served as the basis for PayJunction's right to payment.  The provision in the contract between PayJunction, Glasser and Glasser Images providing that PayJunction may assert the rights of cardholders does not apply to Schacher who is not a party to the contract.

---

[31] Although PayJunction's Consolidated Post-Trial Brief is the first pleading where it raised equitable subrogation or subrogation under section 509, it has repeatedly claimed that it was entitled to stand in the shoes of consumers and assert their fraud claims against Schacher and Glasser.  Schacher did not respond to PayJunction's subrogation theories of recovery in his posttrial closing brief, but he objected to PayJunction's claim that it may stand in the shoes of Glasser Images' customers to show intent to deceive PayJunction in this brief.  See Doc. 80  at 18.

Additionally, PayJunction failed to show that it paid all or part of Schacher's restitution debt.  Schacher consented to entry of a monetary judgment in the sum of $40,000 as restitution for work not completed or performed and unpaid amounts owed to independent contractors.  PayJunction offered no evidence showing an overlap of its chargeback claim payments with Schacher's restitution debt, and the consent judgment offers no specific detail regarding the basis for this sum.  It is possible that this $40,000 sum arises from independent contractor claims or debts incurred by customers who did not use credit cards processed by PayJunction.  Hall estimated that Glasser Images received 25% of its revenue from cash or checks, making this alternative plausible.

PayJunction failed to meet its burden of showing that Schacher was liable for refunding Glasser Images' customers who used credit cards processed by PayJunction or that PayJunction paid Glasser Images' customers *on Schacher's behalf*.  Accordingly, PayJunction is not entitled to contractual subrogation, equitable subrogation or subrogation under 11 U.S.C. § 509 (which does not apply to prepetition debt).  It may not assert Glasser Images' customers' right to bring an exception to discharge action against Schacher under section 523(a)(2).

### 3.    Direct Liability for Actual Fraud

Citing <u>Husky International Electronics v. Ritz</u>, 578 U.S. 355 (2016), PayJunction argues that Schacher is liable for actual fraud.  PayJunction did not plead a cause of action for fraud or civil conspiracy under North Dakota law in its Adversary Complaint or Proof of Claim.  Instead, it relies on section 523(a)(2)(A) to prove the validity and enforceability of its claim.  This theory fails because "[s]ection 523(a)(2)(A) does not provide a cause of action that simultaneously creates a debt and renders it non-dischargeable." <u>In re Vanwinkle</u>, 562 B.R. 671 at 678 (citing <u>Zacharakis v. Melo</u> (<u>In re</u>

Melo), 558 B.R. 521, 561 (Bankr. D. Mass. 2016)); see also Mercer v. Lee (In re Lee),

2024 WL 1261790, at *12 (Bankr. E.D.N.Y. Mar. 25, 2024) ("In Bartenwerfer v. Buckley,

the liability had already been found by a pre-petition judgment. Here, we have no such

finding, and this Court is not prepared to make such a finding based on the record in

this case."); Browne v. Lombard (In re Lombard), 2017 WL 4857416, at *4 (Bankr.

D.N.H. Oct. 25, 2017) (dismissing an adversary complaint because plaintiff failed to

show a right to recover apart from section 523(a)(2)(A) and explaining: "The Supreme

Court's decision in Husky does not provide the means for a creditor to impose liability

for a fraudulent transfer scheme on a debtor; what it does is allow a creditor with a claim

for recovery of such a fraudulent transfer, under a specific state or federal law, to make

out a case that the fraudulent transfer amounts to actual fraud within the meaning of §

523(a)(2)(A)."). See Order Sustaining Debtor's Objection to Proof of Claim #11 filed by

Messiahic, Inc. d/b/a PayJunction for additional analysis on this issue.  Doc. 64, Bankr.

Case No. 22-30243.

     To the extent PayJunction relies on the consent judgment in the North Dakota

Attorney General consumer fraud action to establish its right to payment, this

proposition is rejected.  As noted earlier, PayJunction failed to link its liability for

chargeback claims and its claim for processing fees and attorney fees with Schacher's

consumer fraud admissions or restitution debt, and it may not step into the shoes of

Glasser Images' customers to hold Schacher liable for fraud against Glasser Images'

customers or PayJunction.  Reliance on the consent judgment to establish a civil

conspiracy is likewise rejected.  Schacher did not admit to a fraud conspiracy, and the

consent judgment includes no reference to a conspiracy.  Additionally, PayJunction

offered insufficient evidence to show that Schacher intended to defraud PayJunction or that PayJunction was damaged by Schacher's conduct.

### 4.    Imputed Liability Under an Alter Ego or Veil Piercing Theory

In its Complaint and briefs, PayJunction seeks to impute liability for Glasser Images' and Glasser's debt to Schacher under an alter ego or veil piercing theory. Under North Dakota law, the equitable owner of a corporation may be personally liable if the corporate form was "used to defeat public convenience, justify wrong, protect fraud, or defend crime."  UMB Bank, N.A. v. Eagle Crest Apartments, LLC, 2023 ND 4, ¶ 9, 984 N.W.2d 360 (quoting Taszarek v. Lakeview Excavating, Inc., 2016 ND 172, ¶ 9, 883 N.W.2d 880).  "An element of injustice, inequity, or fundamental unfairness must be present[.]"  Id.  This veil piercing doctrine also applies to limited liability companies. N.D.C.C. § 10–32.1–26(3).  The entity must be the alter ego of the equitable owner, meaning there is "'such a unity of interest and ownership' that a separate existence does not 'in reality exist.'"  UMB Bank, 2023 ND 4, ¶ 10, 984 N.W.2d 360 (quoting Taszarek, 2016 ND 172, ¶ 10, 883 N.W.2d 880).  To determine whether the company is a "mere instrumentality or alter ego of its owner," North Dakota courts evaluate the Hilzendager-Jablonsky factors, which include:

> insufficient capitalization for the purposes of the corporate undertaking, failure to observe corporate formalities, nonpayment of dividends, insolvency of the debtor corporation at the time of the transaction in question, siphoning of funds by the dominant shareholder, nonfunctioning of other officers and directors, absence of corporate records, and the existence of the corporation as merely a facade for individual dealings.

Id. at ¶ 9 (quoting W. Dakota Oil, Inc. v. Kathrein Trucking, LLC, 2022 ND 111, ¶ 7, 974 N.W.2d 630); see also Hilzendager v. Skwarok, 335 N.W.2d 768, 774 (N.D. 1983); Jablonksy v. Klemm, 377 N.W.2d 560, 563 (N.D. 1985).  "The burden of proving the

factors necessary to pierce the veil rests on the party asserting the claim," and courts apply this analysis with caution.  UMB Bank, 2023 ND 4, ¶¶ 10–11, 984 N.W.2d 360.

PayJunction asks this Court to pierce Glasser Images' corporate shield and hold that Schacher is the alter ego of Glasser Images—even though Schacher holds no ownership interest in Glasser Images.  With this remedy, PayJunction seeks to collect Glasser Images' debt from Schacher, who is not contractually liable for this obligation.

PayJunction cites no legal authority for the proposition that courts may pierce the corporate veil to hold a nonshareholder liable, and the Court did not find any authority under North Dakota law.  Other jurisdictions hold that nonshareholders may be liable under an alter ego theory, finding that the veil piercing doctrine is an equitable one that disregards form for substance. See Buckley v. Abuzir, 8 N.E.3d 1166, 1172 (Ill. App. Ct. 2014) (noting that courts and commentators are split, but explaining that "our research shows that the majority of jurisdictions addressing this question allow veil-piercing against nonshareholders."); Gieseke ex rel. Diversified Water Diversion, Inc. v. IDCA, Inc., 826 N.W.2d 816, 829 (Minn. Ct. App. 2013) ("'[A] district court may pierce the corporate veil to impose personal liability against any party who disregards the corporate form, regardless of whether the party holds an ownership interest in the entity' because 'veil piercing is grounded in equity and intended to prevent abuse of corporate protections.'" (quoting Equity Tr. Co. Custodian ex rel. Eisenmenger IRA v. Cole, 766 N.W.2d 334, 339–40 (Minn. Ct. App. 2009))), rev'd on other grounds, 844 N.W.2d 210 (Minn. 2014).

The courts that grant a corporate veil piercing remedy to those seeking to hold a nonshareholder liable for corporate debt typically do so only in those cases where the nonshareholder dominates or controls the corporation.  For example, in Gieseke, the

court found that the sole shareholder knew very little about the corporation, its shares, revenue or financing of its business.  Gieseke, 826 N.W.2d at 830.  Instead, the shareholder's husband (a nonowner) ran the corporation, using it as a façade for the individual dealings of the husband and his shareholder wife.  Id.  Consequently, the court pierced the corporate veil and held both personally liable for the corporation's conversion and tortious interference. Id.  Similarly, in Buckley, the court observed that "those jurisdictions that allow veil-piercing against nonshareholders have not required that the nonshareholder hold other formal roles within the corporation—for instance, as an officer, director, or employee—but rather abandon such formalism in favor of an equitable approach focusing on the individual's domination of the corporation." Buckley, 8 N.E.3d at 1172 (emphasis added); see also Freeman v. Complex Computing Co., 119 F.3d 1044, 1051 (2d Cir. 1997) (finding a nonshareholder may be the equitable owner of a corporation where he exercises considerable authority over the corporation and completely disregards the corporate form); Roohan v. First Guar. Mortg., LLC, 97 A.D.3d 891, 891 (N.Y. App. Div. 2012) ("A nonowner, however, may be held liable for a corporation's torts if he or she 'dominated and controlled [it] to such an extent that [he or she] may be considered its equitable owner[ ]'" (alterations in original) (quoting Guilder v. Corinth Constr. Corp., 235 A.D.2d 619 (N.Y. App. Div. 1997))); Shamis v. Ambassador Factors Corp., 34 F. Supp. 2d 879, 900 (S.D.N.Y. 1999) ("[A] nonshareholder defendant may be, 'in reality,' the equitable owner of a corporation where the nonshareholder defendant 'exercise[s] considerable authority over [the corporation] ... to the point of completely disregarding the corporate form and acting as though [its] assets [are] his alone to manage and distribute.'" (alterations in original) (quoting Lally v. Catskill Airways Inc., 198 A.D.2d 643, 645 (N.Y. App. Div. 1993)));

Fairfield Dev., Inc. v. Georgetown Woods Senior Apartments Ltd. P'ship, 768 N.E.2d
463, 473 (Ind. Ct. App. 2002) (holding a nonshareholder defendant liable because he
was a "principal figure" in the corporation's dealings with the plaintiff); Fontana v. TLD
Builders, Inc., 840 N.E.2d 767, 777 (Ill. App. Ct. 2005) ("The basis of our holding in
Macaluso for imposing the liability of the corporation upon the nonshareholder
defendant were his exercise of ownership control over the corporation such that their
separate personalities did not exist and that the corporation was a business conduit of
the defendant." (citing Macaluso v. Jenkins, 420 N.E.2d 251, 255–56 (Ill. App. Ct.
1981))).

Assuming, without deciding, that—(1) the North Dakota Supreme Court would
find that nonshareholders may be liable under an alter ego theory and (2) PayJunction
established that Glasser Images was insufficiently capitalized and insolvent at all
relevant times, Glasser failed to observe corporate formalities and keep corporate
records and Glasser siphoned and comingled funds—this evidence would not establish
that *Schacher* is the alter ego of Glasser Images and should be liable for its debt.  To
the contrary, the evidence shows that Schacher exercised virtually no control over
Glasser Images.  Decisions regarding contract terms, financial affairs, and personnel
decisions were left exclusively to Glasser.  Schacher's duties did not include accounting
or business analysis, and he never assumed responsibility for the finances of Glasser
Images.  He did not track the number of wedding bookings or analyze the cost of goods
sold.  Schacher's role in soliciting and serving Glasser Images' clients was similar to the
role of McLauren Alexander, who also offered incentives and discounts to clients based
on direction from Glasser.  Schacher was not included in financial meetings between
Glasser and Hall, and he did not meet with accountants, bankers and business

consultants like Zottnick, Kommer, Johnson and Thorp on matters related to the operation of Glasser Images. He had no direct access to Glasser Images' bank accounts or QuickBooks. He did not guarantee Glasser Images' business loans. He did not draft Glasser Images' contracts. He was not a business partner with Glasser, and he did not act like one.

Schacher's transparent use of the Glasser Images' credit card and his receipt of refunds for personal expenses at Glasser's request and with Glasser's consent and knowledge are not sufficient to show control or domination over Glasser Images. Likewise, Schacher's financial gifts to Glasser (which Glasser used to pay Glasser Images employees) and Schacher's willingness to permit a delay in his compensation do not show that Schacher managed or controlled Glasser Images. PayJunction failed to offer evidence sufficient to show that Schacher dominated Glasser Images or exercised control over the company to such an extent that Glasser Images was a conduit for Schacher's business. Based on the evidence received at trial, the Court finds it inequitable to hold Schacher liable for Glasser Images' debt to PayJunction. PayJunction's request for an alter ego/veil piercing remedy is denied.

### 5.    Imputed Liability Under Bartenwerfer v. Buckley

Citing Bartenwerfer v. Buckley, 598 U.S. 69 (2023), PayJunction also alleges that Schacher is vicariously liable for Glasser Images' and Glasser's fraudulent conduct "in his capacity as an agent of Glasser Images, domestic partner of Glasser, and beneficiary of the customer deposits obtained from customers." Compl. at ¶ 179.

In Bartenwerfer, Kate Bartenwerfer and her then-boyfriend, David Bartenwerfer, jointly purchased a house. Acting as business partners, Kate and David remodeled and sold the house. Bartenwerfer, 598 U.S. at 72. David assumed primary responsibility for

the project. The homebuyer obtained a state court judgment against Kate and David, holding them jointly liable for David's fraudulent nondisclosure of material issues with the home. Id. at 73. The Bartenwerfers petitioned for bankruptcy relief, and the judgment creditor brought an adversary proceeding seeking to except their debt from discharge. The bankruptcy court ruled in favor of the judgment creditor. On appeal, the Bankruptcy Appellate Panel affirmed the judgment as to David and remanded as to Kate, holding that section 523(a)(2)(A) barred her from discharging the debt only if she knew or had reason to know of David's fraud. On remand, the Bankruptcy Court determined that Kate lacked such knowledge and entered judgment discharging her debt. After another series of appeals, the Supreme Court held that Congress' use of passive voice in section 523(a)(2)(A) meant a debtor may have a debt excepted from discharge even if someone other than the debtor perpetrated the fraud. Id. at 76 ("The debt must result from someone's fraud, but Congress was 'agnosti[c]' about who committed it." (alteration in original) (quoting Watson v. United States, 552 U.S. 74, 81 (2007))). In the opinion, the Supreme Court emphasized, "523(a)(2)(A) does not define the scope of one person's liability for another's fraud. That is the function of the underlying law[.]" Id. at 81–82.

The Court is not persuaded that Bartenwerfer governs the outcome of this case. Unlike Bartenwerfer, where Buckley secured a state court judgment against both Kate and David Bartenwerfer, PayJunction did not secure a judgment against Schacher or show its contractual right to payment from Schacher. Likewise, PayJunction failed to plead, allege or prove a North Dakota fraud or civil conspiracy cause of action entitling it to recover $977,241.14 from Schacher. As noted above, section 523(a)(2)(A) does not provide a cause of action that simultaneously creates a debt and renders it

nondischargeable.  See Browne v. Lombard (In re Lombard), 2017 WL 4857416, at *4

(Bankr. D.N.H. Oct. 25, 2017).

Also, unlike Bartenwerfer, PayJunction failed to offer evidence sufficient to show

that Schacher was a business partner or de facto partner with Glasser.  The North

Dakota Supreme Court recently outlined the criteria necessary to establish a

partnership under North Dakota law:

> Whether a partnership exists depends on the facts and circumstances of each case, but certain elements are "critical." Gangl v. Gangl, 281 N.W.2d 574, 579 (N.D. 1979). "The critical elements of a partnership are (1) an intention to be partners, (2) co-ownership of the business, and (3) a profit motive." Tarnavsky v. Tarnavsky, 2003 ND 110, ¶ 7, 666 N.W.2d 444. "The existence of a partnership is a mixed question of law and fact, and the ultimate determination of whether a partnership exists is a question of law." Id.

* * *

> Intent to form a partnership is "[o]ne of the most important tests" to determine whether a partnership exists. Ziegler v. Dahl, 2005 ND 10, ¶ 14, 691 N.W.2d 271. "[T]he focus is not on whether individuals subjectively intended to form a partnership, but on whether the individuals intended to jointly carry on a business for profit." Id. Intent can be derived from the actions of the parties and does not need to be vocalized or memorialized in writing. Id. at ¶ 15. Individuals "may inadvertently create a partnership" despite a subjective intention not to do so. Id. at ¶ 14 (quoting Uniform Partnership Act, § 202, cmt. 1 (1997)).

* * *

> "If partners are co-owners of a business, they each have the power of ultimate control." Ziegler, 2005 ND 10, ¶ 21, 691 N.W.2d 271. "Control is an indispensable component of co-ownership which, when combined with profit sharing, strongly suggests the existence of a partnership." Gangl, 281 N.W.2d at 580; see also Tarnavsky v. Tarnavsky, 147 F.3d 674, 677–78 (8th Cir. 1998) (stating co-ownership includes the "sharing of profits and losses as well as the power of control in the management of the business."). A partner does not have to actually exercise control "but only needs to have the right to exercise control in the management of the business." Ziegler, at ¶ 21.

Ziemann v. Grosz, 2024 ND 166, ¶¶ 11, 13, 16, 10 N.W.3d 801; see also Ziegler v.

62

<u>Dahl</u>, 2005 ND 10, ¶ 15, 691, N.W.2d 271 ("We have said participants in a business 'must intend to be part of an association that includes <u>all</u> the essential elements of a partnership for that association to be a partnership.'" (quoting <u>Gangl v. Gangl</u>, 281 N.W.2d 574, 580 (N.D. 1979))); <u>Buchl v. Gascoyne Materials Handling & Recycling, LLC</u>, 2020 WL 7646407, at *4 (D.N.D. Oct. 28, 2020) ("The burden of proving a partnership exists rests with the individual claiming the existence of a partnership.").

Schacher did not hold an ownership interest in Glasser Images.  He credibly testified that he was not interested in becoming a business partner with Glasser, and he never spoke to Glasser about becoming a business partner.  As outlined above, Schacher played no role in designing the business model, securing financing, or managing employees or business finances.  He assumed no responsibilities outside the role of Lead Wedding Client Consultant for Glasser Images.  While both Glasser and Schacher testified Schacher agreed to accept a position with Glasser Images so they could "devote their energy to growing Glasser Images," the only evidence of steps Schacher took to "grow" Glasser Images is greeting clients and booking weddings.  He played no role in advertising, financing or business development.  Glasser did not transfer shares to Schacher, and he did not acquiesce control, the right to control or the power to manage Glasser Images to Schacher.  Schacher did not exercise dominion or control over it.

Schacher's transparent use of the Glasser Images credit card and his receipt of refunds for personal expenses at Glasser's request and with Glasser's consent and knowledge are not sufficient to show control or domination over Glasser Images or a de facto partnership under the circumstances of this case. For better or worse, Glasser decided how to spend or invest Glasser Images' revenue, advertise, borrow and serve

(or not serve) its customers.  The Court is not convinced that Schacher and Glasser were business partners or de facto partners.  Their personal relationship is not sufficient to hold Schacher liable for Glasser's or Glasser Images' debt under North Dakota law or to except this debt from discharge under section 523(a)(2)(A).  See SLK Cap., LLC v. Beach (In re Beach), 651 B.R. 359, 374 (Bankr. E.D. Wis. 2023) (refusing to hold a wife liable for her spouse's debt or except the debt from discharge).  PayJunction's argument that Bartenwerfer compels a finding that Schacher is liable for Glasser's and Glasser Images' debt to PayJunction is rejected.

## III.    CONCLUSION

### A.    PayJunction's Causes of Action Against Glasser

Given the Court's ruling on PayJunction's derivative claim under section 523(a)(2)(A), it is unnecessary to analyze PayJunction's claim that Glasser made false representations to PayJunction under section 523(a)(2)(A) or that Glasser's debt to PayJunction should be excepted from discharge under section 523(a)(6).  The cause of action under section 523(a)(6) is dismissed without prejudice.

The Court considered all other arguments and deems them to be without merit or unnecessary to discuss.

For the reasons stated, Glasser's debt to PayJunction in the sum of $977,241.14 is excepted from discharge under 11 U.S.C. § 523(a)(2)(A).

Judgment may be entered accordingly.

### B.    PayJunction's Causes of Action Against Schacher

PayJunction failed to establish that Schacher owes it a valid and enforceable debt that is excepted from discharge under section 523(a)(2)(A).  Its claims and cause of action are dismissed.

64

The Court considered all other arguments and deems them to be without merit or unnecessary to discuss.

Judgment may be entered accordingly.

Dated: October 11, 2024.


SHON HASTINGS, JUDGE
U.S. BANKRUPTCY COURT